THE COLSON COMPANY, Plaintiff-Appellee, v. ERIC FROST WITTEL, Defendant-Appellant.

Fourth District   No. 4—90—0552

Opinion filed March 21, 1991.—Rehearing denied May 1, 1991.

GREEN, J., concurring in part and dissenting in part.

Peter T. Dole, of Paris, for appellant.

David M. Frisse, of Massey, Anderson & Gibson, of Paris, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In July 1990, plaintiff, the Colson Company (Colson), obtained a preliminary injunction against defendant, Eric Frost Wittel, a former salesman for Colson. The principal thrust of the injunction was to prohibit Wittel from soliciting former customers of Colson and to require Wittel to turn various documents in his possession over to the trial court for examination. Wittel has appealed. We reverse.

Colson's complaint, upon which relief was granted, was filed in June 1990 and requested compensatory damages and a preliminary and permanent injunction. In its complaint, Colson alleged that Wittel, upon leaving the employ of Colson, "took with him information, notes, copies, reports, and other documents, and various forms containing *trade secrets*." (Emphasis added.) Colson further alleged that Wittel used the "trade secrets" to benefit himself and his new employer in selling products to Colson's customers directly in competition with Colson. Colson sought injunctive relief and compensatory damages pursuant to the Illinois Trade Secrets Act (Act) (Ill. Rev. Stat. 1989, ch. 140, par. 351 *et seq.*). The court granted the injunction after an evidentiary hearing and before defendant had answered the amended complaint.

Most of the evidence presented at the evidentiary hearing was undisputed. It showed that Colson was engaged in the design, marketing, production, and sales of custom calendars, a product specially designed to serve a particular customer's needs and business purposes by utilizing a design unique to that customer. Wittel was initially employed by Colson in July 1984 as a national account representative whose job was to solicit customer calendar business. While Wittel's employment was terminated by Colson in February 1985 for economic reasons, he was rehired 10 months later.

Wittel left Colson on April 2, 1990, and one week later joined Corporate Promotions of America, a division of F.L. Companies. After leaving Colson, Wittel contacted five of his former Colson accounts and advised them that he was selling for a new company, which sold both calendars and other products, and that he was no longer affiliated with Colson. The defendant secured business from four of the

five companies he contacted: TWA, Massey-Ferguson, Victory Gardens, and Liberty Life. John Jedd, Colson's president, testified that losing these companies as customers represented a $275,000 loss to Colson.

Substantial testimony was introduced regarding the amount of time and money Colson spent to develop a relationship with a prospective customer. Jedd testified that the process of developing the initial program for a particular customer is long and laborious. As an initial step, the salesmen often must create in the potential customer a perception of need for a custom calendar program. Also, the interaction between the prospective customer and Colson during this period is quite extensive. Jedd stated that approximately three to five years are required before a sale can be made to a prospect. During this period, a substantial amount of information about the potential client is obtained.

Jedd further testified that making a sale to a prospect on a first call is almost impossible. He stated the average Colson salesperson spends $15,000 to $25,000 per year in travel and entertainment expenses, and the first year's expenses associated with hiring a new salesperson usually exceed the income that salesperson generates. Jedd estimated the expense of obtaining a substantial customer ranged from $150,000 to $200,000 or higher.

Wittel testified, however, that acquiring new clients was not as time-consuming as Jedd indicated. According to Wittel, the process would begin by first identifying a prospective customer from either a newspaper or the "red book," a list of approximately 17,000 companies that purchase advertising. From this lead, a salesperson would contact the main headquarters of a prospective customer and request to speak to the person in charge of advertising. Such a call would take 10 seconds to a minute to complete.

Wittel testified that he typically did not devote extensive time before the sale to personal contacts with prospective clients. After the first contact, the next contact would concern a yearly renewal. Wittel testified that when he was hired, Colson gave him sales leads and one existing client to service.

According to Jedd's testimony, information regarding prospective customers was marked "confidential" and given to salespersons on a need-to-know basis because of the time-consuming and expensive nature of cultivating the prospect. Jedd also testified that when Wittel was hired, he was given access to any file pertaining to those prospective clients. Information concerning sales was kept within Colson's five-person sales department, and each salesperson was given

little detail about customers other than his or her own. Jedd said Colson kept a master list of customers, but Wittel was never given a copy of that list.

Wittel acknowledged that he was exposed to information marked confidential regarding companies he had solicited as well as customers and prospects solicited by others in the company. He also acknowledged that reports containing customer information were marked as "top secret proprietary information," and some bore a legend that they had to be destroyed. However, Wittel testified that he did not learn the names and addresses of the customer's sales representatives from these reports. Wittel testified that although he had been exposed to the names of Colson's customers other than his own, he has never made use of that information.

Wittel conceded that Colson disapproved of Wittel's use of his own computer in processing information regarding price and contracts with his customers. Nevertheless, he continued to put customer letters on that computer, as well as a list of his customers and prospects. Wittel admitted that in regard to some customers, this list included the place where the customer lived, the people to contact regarding that account, and the telephone numbers of those people.

The preliminary injunction restrained Wittel from "communication" or "contact" with "any person or entity who was or represented a client, customer," or one identified to him "as a prospective customer *** of [Colson], as of April 2, 1990," and ordered Wittel to withdraw all pending sales proposals to those persons and entities. The injunction order also required Wittel to (1) write a letter to all such persons or entities having his sales proposals, explaining the existence of the injunction; (2) not act adversely regarding Colson's relations with any of its customers; (3) not make use of information gained by him while employed by Colson; and (4) advise the court within 10 days of any documents, records, or other things he had taken with him from Colson and his use of the information contained therein, with such items to be delivered to the court so they could be available for inspection by the parties.

■■■ In *Lee/O'Keefe Insurance Agency, Inc. v. Ferega* (1987), 163 Ill. App. 3d 997, 1002-03, 516 N.E.2d 1313, 1317, this court wrote the following:

"In order for a preliminary injunction to issue the party seeking it must establish by a preponderance of the evidence (1) he possesses a certain and clearly ascertainable right or interest needing protection; (2) there is no adequate remedy at law; (3) irreparable harm will result if it is not granted; and (4) there is

a reasonable likelihood of success on the merits. [Citations.] In addition to consideration of the above criteria, the trial court must conclude that the benefits of granting the injunction outweigh the possible injury which defendant might suffer as a result thereof. [Citations.] Finally, as the decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court, and because its findings may not be disturbed absent a showing of an abuse thereof [citations], the role of a reviewing court is limited to a determination of whether those findings are contrary to the manifest weight of the evidence."

The interest Colson seeks to protect is the information Wittel had concerning Colson's customers. Colson contends that this information constitutes a trade secret within the meaning of section 2(d) of the Act, which defines a trade secret, in part, as follows:

"[I]nformation including but not limited to *** [a] list of actual or potential customers ***, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Ill. Rev. Stat. 1989, ch. 140, par. 352(d).

■ Section 3(a) of the Act provides for the issuance of injunctions against "[a]ctual or threatened misappropriation" of trade secrets. (Ill. Rev. Stat. 1989, ch. 140, par. 353(a).) A misappropriation results from "disclosure or use of a trade secret of a person without express or implied consent by another person who: *** acquired [it] under circumstances giving rise to a duty to maintain its secrecy or limit its use." Ill. Rev. Stat. 1989, ch. 140, par. 352(b)(2)(B)(II).

The foregoing provisions of the Act were in force at all times pertinent here. Prior to the enactment of the Act, a common law doctrine similar to the Act protected trade secrets. The leading case on this issue is *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393. There, the supreme court upheld an injunction prohibiting a former employee from using drawings belonging to his former employer concerning fans manufactured by that employer and from selling fans manufactured by use of those plans. The design for the fans was arguably unique, but could have been discovered by a person taking apart one of the fans and copying the engineering. The injunction was limited in duration to 18 months after the employee left the employment of the employer. The supreme court considered this

length of time to be appropriate because that would be the approximate time necessary for a competitor to tear down one of the fans, discover its engineering, and put a fan of that design through production and into the market.

■ The *ILG Industries, Inc.* court defined a trade secret as "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." (*ILG Industries, Inc.*, 49 Ill. 2d at 92, 273 N.E.2d at 395.) The court held that the factors stated in the Restatement of Torts (Restatement of Torts §757, comment *b*, at 6 (1939)) should be considered in determining whether information is a trade secret. These factors are:

> " '(1) [T]he extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.' "
> *ILG Industries, Inc.*, 49 Ill. 2d at 93, 273 N.E.2d at 396, quoting Restatement of Torts §757, comment *b*, at 6 (1939).

Colson stresses that the detail of information it compiled, and to which Wittel had access at times, constitutes trade secrets for which it may seek protection under the Act. The detail of information it maintains it compiled includes:

> "(1) Customer names; (2) customers' addresses; (3) customers' phone numbers; (4) the fact that customers have a custom calendar program in place; (5) the fact that customers have an existing relationship with the Colson Company; (6) the names of those who make the customers' decisions, both present and past; (7) the names of those with whom one must make contact or deal with concerning the order, negotiations over price, type of calendar, its appearance, and marketing; (8) what features, sizes, types, options, colors, etc., of calendars, and the logos, slogans and themes the customer is interested in; (9) the procedures the customer uses (and has used) for consideration, negotiation, selection, and purchase and/or marketing and distribution of the calendars; (10) its marketing goals for use of the calendar program; (11) its budget for the program; (12) what role the plaintiff must play in the marketing and distribution to

the customers' agents, distributors, branches or affiliates or customers of the calendar selected by the customer; (13) who will pay for the calendars produced; (14) how many units are likely to be required; (15) what special requirements the customer imposes, considering the product or its marketing or internal purchasing or approval procedures; (16) their plans for future custom calendar programs; (17) unique factors in the cost of producing or the pricing of the product for the particular customer; (18) special timing requirements concerning the initial proposal, resolution of production and pricing issues, marketing to distributors, etc., and delivery; and (19) the fact that the customer or those who will be paying the plaintiff for their calendars have proven creditworthy."

Wittel maintains the foregoing information is not difficult for competitors of Colson to obtain. He cites *Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 547 N.E.2d 675, where the court held that neither the customer list nor pricing information of a firm selling and servicing fire extinguishers and cleaning restaurant hoods was a protectable trade secret because the names of the various customers could easily be obtained from the yellow pages of telephone directories. There, the only business areas involved were Chicago and Rockford. Here, the area is the entire nation. Wittel testified that the names of the various potential customers can be obtained from books listing national advertisers. However, Colson argues that the value of the totality of information which Colson seeks to protect does not arise merely from the names of customers and prospective customers, but also from the amount of detail that Colson obtained about them.

■ The major problem with upholding the injunction granted is that, on the record before us, the parties have no agreement restricting Wittel from competing with Colson for customers upon termination of his employment. Colson does not argue that such an agreement exists. The complaint alleged Wittel signed a document in which he agreed that during and after his employment, he would not "disclose or otherwise use any proprietary or confidential information that comes" into his possession during employment. No evidence was presented to the court concerning this agreement, the amended complaint was not verified, and by the time the preliminary injunction hearing was held, Wittel had not answered Colson's complaint or admitted that such an agreement existed. Because this agreement is not before us, we cannot consider any of its terms.

■ Section 2(d)(2) requires that trade secret information must be "subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." (Ill. Rev. Stat. 1989, ch. 140, par. 352(d)(2).) This is similar to the factors set forth in the Restatement of Torts and adopted in *ILG Industries, Inc.*, which consider the extent to which information is known outside of the business, the extent to which the information is known by the employer's own employees, and the extent of the measures taken by the employer to protect its secrecy. Colson presented evidence of the various steps it took to keep certain types of information confidential or to limit the amount of that information available to its own employees. This evidence included testimony that (1) reports about customers were distributed to salespersons on a "need-to-know" basis and expressly marked "confidential, secret information"; (2), such reports were to be destroyed after reading; and (3) at meetings, employees were cautioned that information discussed was confidential and not to be discussed outside the building.

In seeking to support the preliminary injunction, Colson relies on *Agrimerica, Inc. v. Mathes* (1990), 199 Ill. App. 3d 435, 557 N.E.2d 357, *Shapiro v. Regent Printing Co.* (1989), 192 Ill. App. 3d 1005, 549 N.E.2d 793, *Lee/O'Keefe Insurance Agency*, 163 Ill. App. 3d 997, 516 N.E.2d 1313, and *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 490 N.E.2d 1302, all of which concern the question of whether a former employer has a protectable interest in its relationship with its customers so that a former employee can be enjoined from contacting those customers for a reasonable time. However, in all of these cases, the former employee had agreed not to solicit the employers' customers for a reasonable period and not to disclose confidential information. The issue in each of these cases was whether the employer had a sufficient interest in the customer information possessed by the employees to support the covenant. In *Shapiro*, the court found the issue presented was moot. Only in *Agrimerica, Inc.*, did the appellate court uphold the restrictive covenant.

■ Section 396(b) of the Restatement (Second) of Agency permits an agent, upon termination of an agency, absent a contrary agreement, to use secret information concerning customers properly acquired from the principal and committed to memory. (Restatement (Second) of Agency §396(b) (1958).) In *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 228 N.E.2d 742, the circuit court refused to enjoin a salesman who had worked for one employer from soliciting its customers on behalf of another employer. The appellate court affirmed, noting that the information concerning the first employer's

customers was not confidential and the salesman had taken no list with him. Specifically, the appellate court wrote the following:

"If a salesman has agreed to a restrictive covenant in his employment contract, or if he has fraudulently and surreptitiously copied or removed lists of customers from a prior employer, or if the names of actual or potential customers are confidential, not subject to memory, are not publicly listed or otherwise readily obtainable, then, under proper circumstances, such salesman might be enjoined from soliciting business from the customers of his prior employer. Absent such circumstances, however, there can be no such prohibition." *Revcor, Inc.*, 85 Ill. App. 2d at 357, 228 N.E.2d at 746.

In reaching our decision, we do not have the benefit of any decision of an Illinois court of review upholding an injunction against a former employee's solicitation of the customers of the former employer where fraud was not involved and where the employee was not subject to a restrictive covenant.

Regarding the difficulties that arise when a former employee is enjoined from soliciting customers of the former employer, we find persuasive a statement by Federal District Court Judge Milton I. Shadur, in a somewhat similar case involving Illinois law:

"[S]uch information comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses. [Citation.]

Any other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself. It would disserve the free market goal of maximizing available resources to foster competition. Or to frame the issue in the way discussed earlier in this opinion, it would not strike a proper balance between the purposes of trade secrets law and the strong policy in favor of fair and vigorous business competition.

All this does not render helpless an employer worried that the skills and knowledge an employee acquires during the course of employment will give him or her an undue competitive advantage. Nothing prevents such an employer from guarding its interests by a restrictive covenant. But it would really be unfair competition to allow the employer without [(emphasis omitted)] such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for

entering the competitive market." *Fleming Sales Co. v. Bailey* (N.D. Ill. 1985), 611 F. Supp. 507, 514-15.

■ Our analysis of whether the information at issue in this case falls within the definition of "trade secret" under section 2(d)(2) of the Act begins with the observation that this definition includes a list of actual or potential customers that "is the subject of efforts that are reasonable under the circumstances to maintain its *secrecy or confidentiality*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 140, par. 352(d)(2).) The question this statutory definition then raises is, secret from *whom*?

We find that the steps taken by Colson were designed to keep information obtained by or given to a particular salesperson from becoming generally known to others within the company, except on a "need-to-know" basis; however, these steps obviously were not designed to keep that same information from the particular salesperson in question.

Colson's position would be correct if this were a case in which Wittel, while planning to leave Colson's employ, obtained information from files belonging to *other salespersons* so that he could take it with him to his new job. If these circumstances were present in this case, then Wittel would have misappropriated information the "secrecy or confidentiality" of which Colson had taken appropriate steps to maintain. Those steps were taken in order to keep that information from employees like Wittel, and the injunction against Wittel would have been proper. However, this hypothetical case is not the present one. Here, Colson took no steps to keep information gathered by Wittel, while working for Colson, secret from *Wittel*. To even state the proposition in this fashion demonstrates that the Act's definition of "trade secret" is inapplicable here.

■ All of the evidence in this case shows that the information Wittel brought from Colson to use on his new job was either (1) given to him freely by Colson, or (2) developed by Wittel from his "working a client." Colson's real complaint is not that Wittel obtained this information, but that after he obtained it (frequently as a result of Colson's having given it to him), Wittel did not handle it as Colson wished. Colson might be right in this complaint, and Wittel's behavior may very well be "dirty pool"; however, Wittel's behavior does not constitute a violation of the Act. To hold otherwise would be to disregard the plain meaning of section 2(d)(2).

To achieve the kind of protection being sought in this case, Colson should have required its prospective employees to sign restrictive covenants as part of their employment contracts. The prospective em-

ployees could then have bargained about the terms of the restrictive covenants or perhaps have extracted some additional contractual benefits in exchange for Colson's insistence on the covenants. At a minimum, employees, such as Wittel, would then have had advance notice of the limitations upon their future employment as a result of the covenants to which they agreed. Colson's actions in the present case amount to an effort to derive the benefits of a restrictive covenant which it never obtained from Wittel.

For the reasons stated, the orders of the circuit court are reversed.

Reversed.

KNECHT, P.J., concurs.

JUSTICE GREEN, concurring in part and dissenting in part:

I concur in the decision of the majority to reverse the portion of the order for the preliminary injunction which prohibits Wittel from soliciting former customers of Colson and which requires Wittel take affirmative action other than turning over certain documents. I dissent from the decision of the majority to reverse the portion of that order requiring Wittel to turn over certain documents to the clerk of the court.

I agree that under *Revcor, Inc.* and *Fleming Sales Co.*, absent a valid restrictive covenant, a former salesperson cannot be properly restricted from soliciting customers or former customers of a former employer where the names of those customers have been committed to the memory of the salesperson and their names have not been obtained by fraud. This was the situation in regard to the customers Wittel was soliciting here.

I disagree with the majority in regard to their contention that information or customers' names must have been kept secret from the former employee for them to be trade secrets as to him. The *ILG Industries, Inc.* opinion does not indicate the drawings involved there were kept secret from the former employee and obtained by him through stealth. The authoritative quotation from the Restatement of Torts does not make such a requirement (Restatement of Torts §757, comment *b*, at 6 (1939)). (*ILG Industries, Inc.*, 49 Ill. 2d at 93, 273 N.E.2d at 396.) Section 396 of the Restatement (Second) of Agency limits the authority given a former employee to make use of secret customer information obtained from a former employer to that committed to memory and gives no indication that information which can-

not be divulged is limited to that which has been kept secret from the employee.

The *Revcor, Inc.* opinion is more specific in indicating that customer information need not be kept secret from a former employee in order for an injunction to lie without a restrictive covenant. The opinion indicates that, under "proper circumstances," salespersons may be enjoined from soliciting customers of a former employer if a restrictive covenant exists, a list of the customers has "fraudulently or surreptitiously [been] copied or removed" from that employer *"or* if the names of actual or potential customers are *confidential, not subject to memory,* [and] are not publicly listed or otherwise readily obtainable." (Emphasis added.) *Revcor, Inc.*, 85 Ill. App. 2d at 357, 228 N.E.2d at 746.

Here, Wittel was aware of a substantial amount of customer information which had been acquired at great expense to Colson. Substantial effort had been made by Colson to keep this information confidential. Contrary to Colson's direction, Wittel had placed a list of customers with whom he had worked and prospective customers on Wittel's personal computer. He had also placed some letters he had written to customers on that computer and, apparently, he had taken this information with him. In *Fleming Sales Co.*, apparently no customer lists were taken. Depriving Wittel of these lists would not require him to figuratively "perform a prefrontal lobotomy on himself" *(Fleming Sales Co.*, 611 F. Supp. at 514), as long as he is permitted to use information he has committed to memory. I conclude the circuit court was well within its discretion in requiring Wittel to deliver all copies containing the foregoing information to the circuit clerk.

Preliminary relief beyond the requirement that Wittel turn over certain documents to the circuit clerk is hard to justify. Much of the customer information available to Wittel had been committed to memory. This was particularly true in regard to the former customers Wittel had solicited. Determining whether subsequent solicitation by Wittel of other former Colson customers would result from Wittel's memory or former notes would be very difficult, if not impossible, to determine. Accordingly, I agree that except in regard to the documents held by Wittel no other preliminary injunctive relief should have been granted.