ELMER MILLER, INC., Plaintiff-Appellee, v. JEFFREY J. LANDIS *et al.*, Defendants-Appellants.

First District (4th Division)    No. 1—92—2233

Opinion filed September 9, 1993.

Robert P. Sheridan, of Chicago, for appellants.

Greenberg, Keele, Lunn & Aronberg, of Chicago (Gene H. Hansen, of counsel), for appellee.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

In June 1992, the plaintiff, Elmer Miller, Inc. (EMI), obtained a preliminary injunction against the defendants, Jeffrey Landis and Banibal Adde, former salesmen for EMI. Generally, the injunction prohibits the defendants from soliciting any customer of EMI, disparaging EMI in any way, or using any customer list or customer information obtained from EMI. The defendants have appealed. We affirm.

In 1986, EMI purchased the Richard Bennett custom tailor shop in Chicago for $70,000. Of the purchase price, $10,000 was allocated to the inventory and $60,000 to the value of the business, including a list of customers and customer files. EMI also operated a Richard Bennett store in Milwaukee, Wisconsin.

EMI hired Jeffrey Landis to work in the Chicago store in April of 1986. Landis worked continuously at the store until he quit in January of 1992. EMI hired Bannibal Adde for the Chicago store in April of 1987. Adde quit in March of 1992. Both worked as salesmen. Neither signed a confidentiality agreement or a restrictive covenant limiting his right to compete with Richard Bennett after leaving EMI.

EMI generated a computer list of Richard Bennett customers and updated it at least twice a year. When the Chicago store was purchased, the list totalled approximately 1,250 customers. The current list totals about 1,200. Elmer Miller testified that between 75% and 80% of these customers are currently active. In addition to the computer list, the store maintains files of customer names, addresses, measurements, previous order forms, preferred style information, and swatches of the customer's preferred material. Such information often allowed customer's orders to be filled by phone with no need for the customer to visit the store.

Elmer Miller testified that Adde and Landis were informed that the information in the customer files was confidential when they were hired and when they quit. The files were kept in a closed file drawer at the Richard Bennett store. Only the salesmen who contacted repeat customers were permitted access to the customer files.

The following facts emerge from evidence depositions and the testimony at the preliminary injunction hearing. On or about February

14, 1992, after Landis left the Chicago store, businessman Ralph Gidwitz went to the store and spoke with Banibal Adde, the only salesman working there at the time. Adde told Mr. Gidwitz the following: that the Richard Bennett store was losing business, and that he did not expect to be working there much longer. He also asked Mr. Gidwitz if he would like to be sent an announcement for Adde's new business. Mr. Gidwitz received an announcement in the mail in late March. The announcement indicated it was from "Bano Adde and Jeff Landis, formerly with Richard Bennett."

In mid-March 1992, after Adde left Richard Bennett, David Miller, the owner's son, examined approximately 100 customer files in the Chicago store. He testified that approximately 30 files lacked the customer's last order form. In addition to the customer's name and address, the order forms contain measurements, styling information, and fabric choices.

At the end of March 1992, Chicago attorney Walter H. Djokic also received an announcement in the mail for Landis and Adde's new custom tailor shop. Mr. Djokic had been a customer of Richard Bennett since 1982, but only dealt with Charles Kyles, another salesman at the Chicago store. Several days after receiving the announcement, Mr. Djokic received a telephone call at home on his private line. The caller identified himself as Jeffrey Landis and told Mr. Djokic that he and Banibal Adde could service his needs, that they "had his information," and that they could take care of him over the telephone. Concerned that the caller might have his credit information, Mr. Djokic called the Richard Bennett store and told Charles Kyles about the phone call.

Early in April of 1992, another Chicago businessman and customer of Richard Bennett, Richard Johnson, received Landis and Adde's announcement in the mail. Several days later, Mr. Johnson also received a telephone call from Landis about the new tailor shop.

Appellate review of a preliminary injunction is limited. A preliminary injunction does not decide disputed facts or rights, but instead preserves the status quo until there can be a hearing on the merits. (*Shodeen v. Chicago Title & Trust Co.* (1987), 162 Ill. App. 3d 667, 515 N.E.2d 1339.) The trial court has a large measure of discretion in granting or denying a preliminary injunction. (*Disher v. Fulgoni* (1984), 124 Ill. App. 3d 257, 464 N.E.2d 639.) Appellate review is limited to whether or not granting the injunction is against the manifest weight of the evidence. *PCx Corp. v. Ross* (1988), 168 Ill. App. 3d 1047, 522 N.E.2d 1333.

A party seeking a preliminary injunction must show: (1) a clear right or interest needing protection; (2) an inadequate remedy at law; (3) irreparable harm if it is not granted; and (4) a reasonable likelihood of success on the merits. (*Office Mates 5, North Shore, Inc. v. Hazen* (1992), 234 Ill. App. 3d 557, 599 N.E.2d 1072.) Once granted, the only question on review is whether or not there was a sufficient showing to sustain the order of the trial court. The appellate court is not to decide the merits of the case. (*City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33, 380 N.E.2d 1106, 1118; *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125.) Since a preliminary injunction does not resolve factual disputes or determine rights, its appropriateness on review can be determined largely by the sufficiency of the allegations in the complaint. *Fischer v. Brombolich* (1991), 207 Ill. App. 3d 1053, 566 N.E.2d 785; *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123.

The trial court granted the plaintiff the following preliminary injunction:

"1. The Petition for Preliminary Injunction is granted and the Defendants and each of them are restrained from:

a. Soliciting any customer of Richard Bennett or Elmer Miller, Inc. as of March 13, 1992, until final disposition hereof or further order of this Court.

b. Disparaging Richard Bennett or Elmer Miller, Inc. in any way whatsoever including expressly but not exclusively, stating to any person orally, in writing or otherwise that Richard Bennett or Elmer Miller, Inc. is unable to pay its bills or is going out of business.

c. Referring to, utilizing or publishing any customer list or customer information obtained from Richard Bennett or Elmer Miller, Inc.

2. The aforesaid Injunction shall apply to the customers of Richard Bennett or Elmer Miller, Inc. obtained by Jeffrey Landis as specified on a list to be produced by said Defendant unless verified and consented to by the Plaintiff, said list to be presented to Plaintiff's counsel not later than June 8, 1992 and to be presented in open court without further notice on June 23, 1992, at 10:00 a.m. The parties shall report the status of this matter to the Court on June 12, 1992 at 2:00 p.m."

The defendants make two primary arguments on appeal: (1) the trial court abused its discretion by issuing the injunction; and (2) the scope of the injunction is overbroad.

In support of their first argument, the defendants contend the plaintiff failed to show a protectable right or interest in their customer list and customer information. In response, the plaintiff argues that its customer information is afforded protection as a trade secret under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1991, ch. 140, par. 351 *et seq.* (now codified as 765 ILCS 1065/1 *et seq.* (West 1992))).

■ Standards for deciding whether or not a customer list and information are protectable exist both at common law and under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1991, ch. 140, par. 351 *et seq.*). The standards to establish a customer list as a trade secret under the Trade Secrets Act parallel the standards at common law. *Colson Co. v. Wittel* (1991), 210 Ill. App. 3d 1030, 1035, 569 N.E.2d 1082, 1084; *Office Mates 5, North Shore, Inc. v. Hazen* (1992), 234 Ill. App. 3d 557, 575, 599 N.E.2d 1072, 1084; but see *Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 952-53, 547 N.E.2d 675, 677.

The Act defines a trade secret:

> "(d) 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Ill. Rev. Stat. 1991, ch. 140, par. 352(d).

So the Act provides that a customer list is a trade secret if two tests are met. The first test requires the list to be secret enough to derive economic value from it. Here, the list contains 1,200 names, a large number of them active, repeat customers. The list also contains information unique to each customer, so that orders are often filled by phone with no need for the customer to visit the store. Last, the information is known only to the salesmen who fill the orders. The information is not available to other employees, the general public, or to EMI's competitors.

■ The defendants repeatedly stress that customer lists which can be duplicated by reference to a phone book or professional directory are not sufficiently secret to be trade secrets under the Act. (See *Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 677-78 (restaurant hood-cleaning business

patrons can be found in yellow pages); *Office Mates 5, North Shore, Inc. v. Hazen* (1992), 234 Ill. App. 3d 557, 575, 599 N.E.2d 1072, 1085 (businesses which need office support personnel can be found in yellow pages or specialized directory).) The custom tailoring business is distinguishable from the businesses in the above cases. Using a telephone directory, one can easily achieve moderate success in finding restaurants or businesses that need cleaning services or office support. The custom tailoring business caters to a far larger pool of individuals with more particular needs, however. The difficulty of developing a cadre of over 500 active, repeat customers for tailored shirts and suits should not be underestimated. We find defendants' argument unpersuasive. We conclude that EMI's competitors cannot duplicate EMI's list without a significant expenditure of time, effort and expense (*Gillis Associated Industries, Inc. v. Cari-All, Inc.* (1990), 206 Ill. App. 3d 184, 190, 564 N.E.2d 881, 885), and that the list is secret enough that Elmer Miller derives economic value from it.

■ The second test requires the holder to take reasonable steps under the circumstances to maintain secrecy. We note reasonable steps for a two- or three-person shop may be different from reasonable steps for a larger company. (See *Gillis*, 206 Ill. App. 3d 184 (example of multimillion dollar corporation whose secrecy efforts were found insufficient to deem customer information a trade secret).) Customer files were kept in a closed file drawer at the Richard Bennett store. Elmer Miller testified that Adde and Landis were informed when they were hired and when they quit that the information in the files was confidential. Further, only the salesmen who contacted repeat customers had access to the information in the repeat customer files. We believe such efforts are reasonable for a small tailor shop to maintain the secrecy of a customer list and customer information.

The defendants cite several recent cases where the court has held a customer list or customer information not to be a trade secret or a protectable interest. (See *Office Mates 5*, 234 Ill. App. 3d 557; *Colson*, 210 Ill. App. 3d 1030; *Gillis*, 206 Ill. App. 3d 184; *Carbonic*, 190 Ill. App. 3d 948.) To the extent that *Colson* stands for the view that to qualify as a trade secret a customer list must have been kept secret from the very employee charged with misappropriating the list, we choose not to follow it. (See *Colson*, 210 Ill. App. 3d at 1041-42 (Green, J., dissenting).) Otherwise, the following facts distinguish this case from those cited by the defendants: (1) the plaintiff allocated $60,000 of the $70,000 purchase price of the business for the customer list and customer information; (2) only the employees who needed to know the information had access to it; (3) the customer files

contained a high percentage of active, repeat customers, making the list valuable to a competitor; (4) the customer files contained the personal style and fabric preferences of the customer, valuable to and not easily duplicated by a competitor; and, most importantly, (5) the plaintiff has alleged that the defendants improperly took part of the customer list when they quit. See *Colson*, 210 Ill. App. 3d at 1039; *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 358, 228 N.E.2d 742, 746 (where lack of improper taking of list was key factor in denying injunction.)

The defendants urge, finally, that the injunction is overly broad. Injunctive relief should not go beyond the need to protect the legitimate interests of the plaintiff and should not unduly burden the defendant. (*Wilson v. Wilson* (1991), 217 Ill. App. 3d 844, 577 N.E.2d 1323; *House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32, 36-39, 225 N.E.2d 21, 25.) The defendants argue that if they undertake a general solicitation of a large number of individuals for their new business they might inadvertently solicit one of Richard Bennett's customers and so violate the injunction. While this may be true under a broad reading of the injunction, the plaintiff asserted in its brief and at oral argument that it would not press a general solicitation as violative of the injunction. Further, in a case such as this where an improper taking of a customer list is alleged, the circuit court must take steps to insure that the defendants are not using a general solicitation as a guise for soliciting customers from the allegedly stolen list. Thus, the injunction is worded as narrowly as possible because fraud in the taking of a customer list has been alleged. See *Revcor, Inc.*, 85 Ill. App. 2d at 357; *Veco Corp. v. Babcock* (1993), 243 Ill. App. 3d 153, 160, 611 N.E.2d 1054, 1059.

Affirmed.

JIGANTI,* P.J., and JOHNSON, J., concur.

---

*Justice Jiganti participated in the disposition of this case prior to his retirement.