BRIAN L. JACKSON, Plaintiff and Counterdefendant and Appellant and Cross-Appellee, v. MARK D. HAMMER *et al.*, Defendants and Counterplaintiffs and Appellees and Cross-Appellants.

Fourth District    No. 4—94—0569

Argued January 25, 1995.—Opinion filed June 29, 1995.—Rehearing denied September 1, 1995.

Howard W. Feldman and Fredric Benson (argued), both of Feldman & Wasser, of Springfield, for appellant.

Donald E. Brilley (argued), of Brilley & Brewster, of Decatur, for appellees.

JUSTICE GREEN delivered the opinion of the court:
In July 1989 plaintiff, Brian L. Jackson, bought a Springfield

hobby shop business known as the Whistle Post from defendants Mark and Linda Hammer. In November 1991, plaintiff filed the instant suit for declaratory and injunctive relief, alleging breach of proprietary and contractual rights and violation of the Illinois Trade Secrets Act (Act) (Ill. Rev. Stat. 1991, ch. 140, pars. 351 through 359) against the Hammers and defendant Tim Fleckenstein. In February 1994, defendants counterclaimed for attorney fees pursuant to the contract of sale for the business.

After a bench trial in April 1994, the trial judge ruled in favor of defendants on the complaint and in favor of plaintiff on the counterclaim. In June 1994, the trial court denied defendants' motion for Rule 137 sanctions. (See 155 Ill. 2d R. 137.) Plaintiff appeals, arguing that defendants' use of a customer list from the Whistle Post was a breach of the contract of sale and a violation of the Act. Defendants cross-appeal, arguing that there was no breach of contract, the Act does not apply and defendants are entitled to attorney fees under the contract of sale. We reverse and remand the denial of attorney fees, and affirm the ruling in favor of defendants on the complaint and the denial of Rule 137 sanctions.

Around 1984, Mark and Linda Hammer opened a hobby shop in Decatur, Illinois. In 1987, they bought a hobby shop in Springfield, Illinois, known as the Whistle Post. The Whistle Post was run by Tim Fleckenstein.

Before buying the Whistle Post, the Hammers had a customer list in the Decatur store. When they bought the Whistle Post, there were some cards containing customers' names and phone numbers. The Hammers used these cards and continued to develop a list by compiling names and addresses of customers. At the Whistle Post, blank cards were made available for customers to fill out with information on themselves. These cards were then kept in a file box. The customer list was developed exclusively by having customers who came to the store fill out the cards. Mark testified that he could recite approximately one-half of the names from the Whistle Post customer list.

While the Hammers still owned both stores, they copied the cards that were at the Whistle Post and took them back to the Decatur store. The Hammers then added the names from the Whistle Post cards to the Decatur list to form one master list, which they entered on their computer. Once this list was made, the Hammers could not tell from which store a particular name on the list came. This was done so that flyers could be sent out from Decatur to everyone on the customer list. Prior to the sale, the Hammers never told plaintiff that the list had been copied.

The July 1989 contract by which the Hammers sold plaintiff the Whistle Post provided for the sale of certain tangibles "and the trade, business name, telephone number and listing, goodwill, and all other intangible assets of the Business." The contract also contained a non-compete clause, whereby the Hammers agreed "to refrain from directly or indirectly carrying on or engaging in any retail business that is similar to the [Whistle Post] *** within a 30[-]mile radius of Springfield for a period of 2 years"; and an "entire agreement" clause.

Before plaintiff signed the contract for the sale of the store, he was aware of the existence of the customer cards. Plaintiff and Mark also discussed the customer list as a way of notifying customers if the store moved locations. Plaintiff did move the store in August 1989. Plaintiff claims that before closing the deal, he checked to see if the file box was still in the store.

After the closing, the Hammers left the file box with the cards at the Whistle Post. Mark testified that the file box was left in the store and that plaintiff got the box with the store.

In September 1989, after the sale of the Whistle Post to plaintiff, the Hammers sent out an advertising flyer for the Decatur store, "Hammer's Hobbies." The flyers were sent to everyone on the master customer list, which included approximately 100 to 130 customers from both the Decatur store and the Whistle Post.

Plaintiff learned of this flyer from a customer of the Whistle Post who had received one. Plaintiff then had his attorney send the Hammers a letter protesting the solicitation of prior customers of the Whistle Post as a violation of the contract. Mark then met with plaintiff outside the Whistle Post. Plaintiff testified that he complained to Mark about his sending flyers into the noncompete area and about his using the Whistle Post customer list to do so. Plaintiff testified that Mark said that the mailing of flyers to customers of the Whistle Post was an inadvertent mistake, and that he would remove those names from the master list. Mark claimed that he told plaintiff that he (Mark) misunderstood the noncompete clause; he thought that he was only prohibited from opening a retail store in the area and was allowed to solicit by mail. He also claimed that plaintiff did not complain about his use of the Whistle Post customer list. Mark told plaintiff that he would not send anything into the noncompete area. Mark then went to his computer and separated the names with addresses within the noncompete radius from all the others.

In August 1991, when the noncompete clause had expired, the Hammers opened a new hobby store in Springfield known as Springfield Hammer's Hobbies. In September 1991, the Hammers sent out 172 copies of a second flyer to all names on their customer

list, announcing the opening of the new store. This included the names that had originally come from the Whistle Post list, and that Mark had "removed" at plaintiff's request.

Plaintiff learned of the second flyer from a customer who had received one. Plaintiff complained to Mark about his use of the customer list for the flyer. Plaintiff told Mark that he believed Mark had sold him the customer list and could not use it to solicit even though the noncompete clause had expired. Plaintiff claimed that Mark said the use of the Whistle Post customer list for the second flyer was an inadvertent mistake.

In November 1991, plaintiff filed the instant complaint for declaratory and injunctive relief based on both the 1989 and 1991 mailings. Count I alleged breach of contract, claiming that plaintiff had purchased the Whistle Post customer list and the Hammers' use of it violated plaintiff's proprietary and contractual rights. Count II alleged a violation of the Act, claiming that the Hammers' acquisition and use of the Whistle Post customer list after its sale to plaintiff constituted a "misappropriation" as defined in the Act. Count III alleged a violation of the Act by Fleckenstein.

In August 1992, defendants filed a counterclaim against plaintiff, which count was later voluntarily dismissed. In February 1994, defendants amended their counterclaim, adding counts for attorney fees pursuant to a provision in the contract of sale and pursuant to the Act.

Prior to trial, the parties filed motions for summary judgment. After a hearing in December 1993, the trial court ruled:

"[T]he sale of assets include[d] the customer list that was left at Plaintiff's place of business. The Court finds further that the non-competition clause governs to the extent that *any customers could be solicited after the expiration of the non-competition clause*, and the Plaintiff's prayer for injunctive relief after that date is denied." (Emphasis added.)

A bench trial was held in April 1994 and the trial judge thereafter issued an order holding: "[o]n the Complaint, the Court finds the issues for the Defendant[s] and against the Plaintiff. On the counterclaim, the Court finds the issues for the Counter-defendant and against the Counter-plaintiff[s]. Cause stricken." In May 1994, plaintiff appealed and the cause was dismissed on motion of the defendants for lack of an appealable order (*Jackson v. Hammer* (4th Dist. 1994), No. 4—94—0441 (order of dismissal)).

Later in May 1994, defendants filed a Rule 137 motion for sanctions, seeking costs and attorney fees, this superseding plaintiff's appeal, which this court then dismissed on June 1, 1994. Later in June

1994, after hearing arguments on the motion, the trial court entered an order denying the motion.

This appeal and cross-appeal followed.

■ Plaintiff first argues that the trial court committed reversible error by failing to declare that the retention and use of the Whistle Post customer list by the Hammers was a breach of contract. In order to sustain a cause of action for breach of contract, a plaintiff must establish that there was a wrongful act and that a loss or damages resulted directly from it. (*Economy Fire & Casualty Co. v. GAB Business Services, Inc.* (1987), 155 Ill. App. 3d 197, 201, 507 N.E.2d 896, 899.) Plaintiff claims that there were two separate and distinct breaches: (1) the mailing of the first flyer into the noncompete territory within the proscribed two-year period; and (2) the retention and use of the Whistle Post customer list both during and after the noncompete period.

Plaintiff claims that it was wrongful for the Hammers to send any advertising into the noncompete area. The Hammers admitted that in September 1989, they mailed out advertising flyers for the Decatur store to customers within the noncompete area. This appears to be a violation of the noncompete clause, which prohibited the Hammers from "indirectly carrying on or engaging in any retail business that is similar to the business being sold." In addition, Mark agreed that such action was prohibited by the noncompete clause and agreed not to send anything else into the area within the time period. Thus, plaintiff has established a wrongful act in the mailing of the 1989 flyer, the first element of the cause of action.

Damages, however, to be recoverable, must not be merely speculative. (*Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 808, 443 N.E.2d 36, 42.) Here, plaintiff offered only slight evidence concerning damages from the September 1989 mailing. Plaintiff noted that Mark Hammer did not keep complete records of sales at the Decatur store so it was possible that persons on the Whistle Post customer list who received the September 1989 flyer did go to the Decatur store and make purchases. In addition, plaintiff testified as to one instance where a person on the Whistle Post customer list had received Hammer's September 1989 flyer and told plaintiff that he subsequently had gone to the Decatur store and purchased items there within the two-year noncompete period. Plaintiff offered neither further evidence of damages, nor evidence of how much money this one customer spent. Thus, the trial court's decision against plaintiff was not against the manifest weight of the evidence.

■ Plaintiff next argues that the Hammers had no right to use the Whistle Post customer list for any purpose at any time, before or

after expiration of the covenant not to compete. The determination of whether the Hammers ever had a right to use the Whistle Post customer list depends upon whether the customer list was sold with the store. Defendants argue that the trial court erred in finding that the Whistle Post customer list was included in the contract for sale of the store because it was not expressly included, it is not part of "goodwill," and it is not an "intangible asset."

Whether a contract term is ambiguous and in need of construction is a question of law for the court. (*Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill. 2d 281, 288, 565 N.E.2d 990, 994; *Russell v. Jim Russell Supply, Inc.* (1990), 200 Ill. App. 3d 855, 867, 558 N.E.2d 115, 124.) The construction of a written contract is also a question of law for the court. (*Russell*, 200 Ill. App. 3d at 867, 558 N.E.2d at 124.) Here, the trial court construed the contract to include the sale of the customer list left at the store.

In *Weitekamp v. Lane* (1993), 250 Ill. App. 3d 1017, 620 N.E.2d 454, the defendant argued, as in the instant case, that because the written agreement did not refer to the transfer of goodwill or customer lists, these elements could not be included in the sale. (*Weitekamp*, 250 Ill. App. 3d at 1024, 620 N.E.2d at 459.) The appellate court, however, concluded that a court may find that these elements are implicitly included in the transfer of a business. (*Weitekamp*, 250 Ill. App. 3d at 1024, 620 N.E.2d at 459.) In this case, in light of the fact that plaintiff and Mark discussed the customer list before the sale and the Hammers left the file box with the customer cards in the store purposely for the plaintiff, the trial court could properly find that the customer list was sold with the store.

Since the customer list was sold with the store, plaintiff argues that the Hammers had no right to use it, before or after the expiration of the covenant not to compete, citing *Murphy v. Murphy* (1975), 28 Ill. App. 3d 475, 328 N.E.2d 642. In *Murphy*, the plaintiff and the defendant were partners in an insurance business. The defendant then sold the plaintiff his interest in the business with a sale agreement expressly providing that all lists of policyholders would be the sole property of the plaintiff. The parties then entered into a three-year covenant not to solicit whereby the defendant agreed not to solicit business from present customers or to disclose the names of customers to others.

After the covenant not to compete expired, the *Murphy* defendant used some of the policyholder lists to successfully solicit his own business and argued that after the expiration of the covenant not to solicit, he had an unlimited right to solicit former customers of the plaintiff. The court disagreed and held that because the sale agree-

ment made the policyholder lists the sole property of the plaintiff, the defendant could *never* use those particular lists. (*Murphy*, 28 Ill. App. 3d at 478, 328 N.E.2d at 644.) The defendant could solicit any customers (customers are not property); however, he could not use the plaintiff's property to do so, he could only use his memory or other means available to the general public. *Murphy*, 28 Ill. App. 3d at 479, 328 N.E.2d at 645.

Therefore, plaintiff's argument turns upon whether the Whistle Post customer list became his *exclusive* property, or whether he only bought a version of the list (the cards at the Springfield store). Unlike *Murphy*, where the language of the sale contract included "all *** lists" (*Murphy*, 28 Ill. App. 3d at 477, 328 N.E.2d at 643), the contract here included no such language and included a clause reciting that the written contract terms constituted the entire agreement between the parties. Instead, as noted above, plaintiff relied on the trial court to construe the contract. In its finding of November 1993, the trial court found "the sale of assets include[d] the customer list that was left at Plaintiff's place of business." This language refers to only one specific copy of the customer list, the one left at the store. This is significant, because at the time of this finding, the court had been informed of the existence of several paper and computer copies of the customer list. Nonetheless, the court chose to award plaintiff ownership of only one specific copy. Therefore, unlike in *Murphy*, plaintiff did not receive the exclusive and permanent right to use the customer list. As a result, the Hammers' retention and use of the customer list, in and of itself, was not wrongful and did not constitute a breach of contract.

Plaintiff next argues that the trial court committed reversible error in failing to declare that the retention and use of the Whistle Post customer list by the Hammers constituted a violation of the Act. He argues that, pursuant to the Act, the Whistle Post customer list was his "trade secret," and the Hammers "misappropriated" it.

■ The Act defines "trade secret" as including a customer list that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." (Ill. Rev. Stat. 1991, ch. 140, pars. 352(d)(1), (d)(2).) This definition codifies two distinct requirements present under the Illinois common law. (*Gillis Associated Industries, Inc. v. Cari-All, Inc.* (1990), 206 Ill. App. 3d 184, 189, 564 N.E.2d 881, 884.) Since plaintiff never had exclusive ownership of the customer list, he cannot meet the first requirement. Under the second requirement, the

information must be the subject of reasonable efforts to maintain its secrecy. *Gillis*, 206 Ill. App. 3d at 190, 564 N.E.2d at 884.

In *Gillis*, the court held that the customer list of the plaintiff, a multimillion dollar company, was not a "trade secret" because the plaintiff failed to prove that it was the subject of reasonable efforts designed to protect its secrecy. *Gillis*, 206 Ill. App. 3d at 192, 564 N.E.2d at 886.

In *Gillis*, the plaintiff's customer list was only available on a computer, and only three key employees had access to this computer. In addition, all employees received an employee manual that notified them that company "information" was confidential. (*Gillis*, 206 Ill. App. 3d at 191, 564 N.E.2d at 885.) Nonetheless the court found that no evidence existed to show that the plaintiff took any affirmative measures to keep its lists secret. No evidence was presented regarding internal or external physical security, that confidentiality agreements or understandings existed among those having access to plaintiff's lists, that plaintiff's lists contained confidentiality stamps or were kept under lock and key, or that employees received entrance and exit interviews imparting the importance of confidentiality. *Gillis*, 206 Ill. App. 3d at 192, 564 N.E.2d at 886.

However, the determination of what steps are reasonably necessary to protect information is different for a large company than for a small one. (*Elmer Miller, Inc. v. Landis* (1993), 253 Ill. App. 3d 129, 134, 625 N.E.2d 338, 342.) In *Miller*, the plaintiff was the owner of a small tailor shop who sought an injunction against former employees for using his customer lists. The plaintiff's customer information was kept in a closed file drawer at the shop; the employees were informed when they were hired and when they quit that the information in the files was confidential; and only specific salesmen had access to customer information. (*Miller*, 253 Ill. App. 3d at 134, 625 N.E.2d at 342.) After specifically noting the holding in *Gillis*, the court in *Miller* found that, considering the size of the plaintiff's business, he had made reasonable efforts to protect the secrecy of his customer lists as required by the Act. *Miller*, 253 Ill. App. 3d at 134, 625 N.E.2d at 342.

■ Despite the fact that plaintiff in the instant case has a small business, he nonetheless has not taken reasonable steps to protect the secrecy of the customer lists. Plaintiff first argues that the effort he made to keep the list secret was to "*purchase it from the Hammers without reservation of rights by the Hammers,* and doing so satisfies the requirement of Section 2(d)(2) of the Act." (Emphasis in original.) In other words, he never gave them permission to use it. This does not amount to an effort to keep the list secret; the Act

requires a plaintiff to take "affirmative measures" to prevent others from using information. (*Gillis*, 206 Ill. App. 3d at 192, 564 N.E.2d at 886.) If anything, plaintiff only made an effort to get a copy for his own use, not to prevent others from using the list. The Act's requirement of an effort on plaintiff's part cannot be fulfilled by a lack of effort on the defendants' part.

Plaintiff next argues that his affirmative steps to maintain the secrecy of the list included transferring the names on the list to his computer, to which only he and his father had access, and taking the file box containing the cards to his house. This, he claims, is evidence that his efforts to protect the secrecy of the lists were beyond even those of the plaintiff in *Miller*. However, unlike the plaintiff in *Miller*, the record shows no discussions by plaintiff with his employees concerning the confidentiality of the customer lists.

More important, the circumstances of this case are different than in *Miller*. Here, plaintiff first saw the customer sign-up list at the register when the Hammers owned the store; it was out in the open for anyone to see. After the Hammers sent the first flyer, plaintiff relied solely on them to remove names. He did not ask for a copy of the computer list, he did not give the Hammers any specific instructions on what names to delete, nor did he make any other efforts to limit the use of the list. In light of the fact that plaintiff knew that the Hammers were competitors, the trial judge as trier of fact could find that this was not a reasonable way to protect the secrecy of the list. In addition, defendants filed the 33-page customer list as one of several exhibits appended to an affidavit during discovery, and it has remained part of the public court file in this case since August 20, 1992.

While both *Miller* and *Gillis* were decided after the enactment of the Act, standards for deciding whether a customer list is protectable also existed under the common law. In fact, the standards to establish a customer list as a trade secret under the Act parallel the common law standards. (*Miller*, 253 Ill. App. 3d at 133, 625 N.E.2d at 341.) Thus, common law cases may be helpful in analyzing plaintiff's claim under the Act.

The leading case on the issue of protecting trade secrets, *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393, held that several factors should be considered in determining whether information is a trade secret. (*ILG*, 49 Ill. 2d at 93, 273 N.E.2d at 396.) Of these factors, the most important is whether and how an employer acts to keep the information secret. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 356, 425 N.E.2d 1034, 1037.) Cases applying this standard have denied trade secret status for

customer lists where the information was not kept under lock and key (*Cincinnati Tool Steel Co. v. Breed* (1985), 136 Ill. App. 3d 267, 278, 482 N.E.2d 170, 177), where the employer's competitors knew the employer's customers (*Prudential Insurance Co. v. Van Matre* (1987), 158 Ill. App. 3d 298, 307, 511 N.E.2d 740, 745-46), and where the employer did not take steps to ensure that his employees understood that the information was confidential or secret (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 766, 424 N.E.2d 719, 725). Here, plaintiff's customer lists were not kept under lock and key, defendants (plaintiff's competitor) knew many of plaintiff's customers, and the record contains no evidence that plaintiff took steps to explain the secrecy or confidentiality of the lists to his employees. Therefore, plaintiff is not entitled to trade secret protection under the Act, and all issues pertaining to the Act were properly resolved against him.

■ Plaintiff next argues that the trial court committed reversible error in failing to enjoin defendants from further retention and use of the Whistle Post customer list. Before an injunction may be granted, plaintiff must first prove that he has a clearly ascertained right in need of protection. (*Postma v. Jack Brown Buick, Inc.* (1993), 157 Ill. 2d 391, 399, 626 N.E.2d 199, 204; *Central Water Works Supply, Inc. v. Fisher* (1990), 240 Ill. App. 3d 952, 955, 608 N.E.2d 618, 621.) Plaintiff argues that his sole and exclusive ownership of the Whistle Post customer list is a clearly ascertained right. However, as discussed above, plaintiff never had *exclusive ownership* of the Whistle Post customer list, and therefore he has no clearly ascertained right in need of protection.

In addition, courts will deny the granting of an injunction if enforcement is infeasible or impossible. (See *Petrzilka v. Gorscak* (1990), 199 Ill. App. 3d 120, 126, 556 N.E.2d 1265, 1269; *Hamer Holding Group, Inc. v. Elmore* (1993), 244 Ill. App. 3d 1069, 1075, 613 N.E.2d 1190, 1195.) Here, plaintiff concedes that defendants have the right to contact all of the people on the Whistle Post customer list; however, he seeks to prevent defendants from using the list itself as a means to do so. Since the original list from the Whistle Post probably only contained around 60 names (the combined list from the Whistle Post and the Decatur store only contained 100 to 130 names), and Mark testified that he could recite one-half the names from memory, plaintiff seeks to prevent defendants from using only approximately 30 unspecified names on the Whistle Post list. In light of the fact that defendants now have their own store in Springfield, customers' names can be obtained at trade shows, and defendants' employees may also remember customer names, it will be nearly

impossible in the future to prove whether defendants have used the original Whistle Post list. Therefore, for this reason also, plaintiff's request was properly denied.

■ By cross-appeal, defendants challenge the trial court's unexplained denial of their counterclaim counts. Count II was a claim for attorney fees pursuant to a provision in the contract of sale which allowed attorney fees for the prevailing party in any litigation. Count III sought attorney fees pursuant to section 5 of the Act (Ill. Rev. Stat. 1991, ch. 140, par. 355).

The attorney fees clause of the contract of sale provided:

> "Should any arbitration or litigation be commenced between the parties to this contract concerning the rights and duties of either party in relation to the Business or this contract, *the prevailing party in the* arbitration or *litigation shall be entitled to* (in addition to any other relief that may be granted) *a reasonable sum as and for attorneys' fees in the* arbitration or *litigation* which sum shall be determined by the court or other person presiding in the arbitration or litigation or in a separate action brought for that purpose." (Emphasis added.)

Contractual provisions for attorney fees must be strictly construed, and the court must determine the intention of the parties with respect to the payment of attorney fees. (*Helland v. Helland* (1991), 214 Ill. App. 3d 275, 277-78, 573 N.E.2d 357, 359.) A party can be considered a "prevailing party" for the purposes of awarding fees when he is successful on any significant issue in the action and achieves some benefit in bringing suit, receives a judgment in his favor, or by obtaining an affirmative recovery. *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.* (1993), 240 Ill. App. 3d 737, 753, 607 N.E.2d 1337, 1348.

Plaintiff claims that both parties prevailed because the trial court ruled in defendants' favor on some issues and in his favor on the issue of the ownership of the Whistle Post customer list. Plaintiff cites *Grossinger* in support of this proposition, but omits the second part of the test enunciated therein, which also requires that a party that is successful on a single issue "*achieves some benefit in bringing* [*the*] *suit.*" (Emphasis added.) (*Grossinger*, 240 Ill. App. 3d at 753, 607 N.E.2d at 1348.) Here, although the trial court did rule in plaintiff's favor, *i.e.*, that a copy of the Whistle Post customer list was sold to him, plaintiff received no damages, injunction, or other benefits from bringing the suit.

In addition, the ownership of the Whistle Post customer list was only a subissue under the count for breach of contract. It should be noted that the court ruled against plaintiff on the issue of whether

defendants could be enjoined from using the Whistle Post list after the noncompetition period expired. This must also be compared to the judgment in defendants' favor on all counts of plaintiff's complaint. As such, a strict construction of the attorney fees clause of the contract should have resulted in an award of attorney fees for defendants, and we reverse and remand for further proceedings to that end.

■ Defendants next argue that plaintiff's claim of trade secret misappropriation was made in a bad-faith effort to stop them from lawfully competing with him. The Act provides if "a claim of misappropriation is made in bad faith, *** the court may award reasonable attorney's fees to the prevailing party." (Ill. Rev. Stat. 1991, ch. 140, par. 355(i).) Defendants rely solely on the testimony of John Firpach, who testified that he heard plaintiff comment, in response to the news that defendants were going to open a shop in Springfield, "[h]e said he was going to have to figure out some way to stop him, take him to court if he had to." The testimony regarding this discussion is not, however, much support for a finding of bad faith. Plaintiff might have been referring to stopping defendants from using the Whistle Post list, which plaintiff felt was legally and exclusively his. We cannot say the evidence sufficed to require an award of attorney fees under the Act.

■ Finally, defendants appeal the denial of Rule 137 sanctions, arguing that plaintiff's claims were brought in bad faith. Whether to impose sanctions pursuant to Rule 137 is within the sound discretion of the trial court and its decision will not be disturbed absent an abuse of discretion. (*Moorhead Machinery/ Westinghouse v. Industrial Comm'n* (1994), 263 Ill. App. 3d 936, 942, 636 N.E.2d 965, 969.) Defendants again rely on Firpach's testimony, but it does not clearly demonstrate the complaint was brought in bad faith. In addition, the trial court did rule in plaintiff's favor on the issue of whether a copy of the customer list was sold with the Whistle Post. Therefore, the trial court was within its discretion in denying Rule 137 sanctions.

For the foregoing reasons, the judgment of the trial court against plaintiff on the complaint is affirmed. On the cross-appeal, the judgment denying attorney fees under the contract is reversed and remanded for a determination of the amount to be awarded to defendants; the trial court's denial of attorney fees under the Act and of Rule 137 sanctions is affirmed.

Affirmed in part; reversed in part, and cause remanded with directions.

KNECHT, P.J., and COOK, J., concur.