GILLIS ASSOCIATED INDUSTRIES, INC., Plaintiff-Appellee, v. CARI-ALL, INC., *et al.*, Defendants-Appellants.

First District (1st Division) No. 1—90—0164

Opinion filed September 28, 1990.—Rehearing denied December 21, 1990.—Modified opinion filed December 31, 1990.

Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., of Chicago (David S. Heller, Daniel P. Shapiro, and Mindy B. Gordon, of counsel), for appellants.

Johnson, Cusack & Bell, Ltd., of Chicago (William V. Johnson, Joseph R. Marconi, and Kevin G. Owens, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Gillis Associated Industries, Inc. (plaintiff), is the former exclusive distributor for Cari-All, Inc. (defendant), a manufacturer of wire shelving for the food, health, and industrial markets in the United States and Canada. This action for preliminary injunctive relief, as part of a larger, multicount suit, arose after plaintiff's national sales manager, Mark Oleska, left plaintiff's employ and began working as defendant's regional sales manager. Plaintiff alleges that upon leaving, Oleksa misappropriated plaintiff's confidential customer list in violation of the Illinois Trade Secrets Act (Ill. Rev. Stat. 1987, ch. 140, par. 351 *et seq.*) and tendered it to defendant, which then began using it in competition with plaintiff. Plaintiff further alleges that Oleska misappropriated a second list containing detailed information concerning plaintiff's sales representatives, each of whom defendant later contacted despite knowing that the representatives were forbidden by a restrictive covenant from working for defendant.

On December 18, 1989, the circuit court of Cook County ordered that defendant be preliminarily enjoined from (1) using plaintiff's customer and sales representative lists and ordered their return to plaintiff, (2) contacting, soliciting, interfering, or otherwise doing business with plaintiff's independent sales representatives currently under contract with plaintiff, and (3) doing business with any cus-

tomer on plaintiff's customer list unless defendant learned of the identity of such customer through means independent of the list.

Defendant appeals from this order, contending the trial court erroneously concluded that plaintiff's customer list constitutes a trade secret. Additionally, defendant contends that plaintiff was under a contractual duty arising from the parties' distributorship agreement to provide defendant with the information contained on the list. Defendant further contends that the distributors named on the second list are being held to an invalid restrictive covenant and that the covenants are inconsistent with its right to terminate plaintiff under the parties' distributorship agreement. Finally, defendant alternatively claims plaintiff is not entitled to relief due to unclean hands. For the reasons that follow, this court reverses the order granting preliminary injunctive relief as to plaintiff's customer list, and reverses and remands for modification the order regarding plaintiff's independent sales representatives.

Defendant is a Canadian corporation that manufactures a wire shelving system that is designed and marketed to consumers on its suitability for easy expansion and with the hope of repeat customer purchases. The wire shelving industry is very competitive, with defendant having about 4% of a $120 to $150 million market.

Prior to 1984, distribution of defendant's product within the United States was limited to distribution within the health care industry. During this time, defendant's wholly owned subsidiary and United States affiliate, Cari-All, Ltd., acted as defendant's sale and distribution arm for its products within the United States market.

In 1983, in order to expand its operations in the United States, defendant approached plaintiff, an Illinois corporation then representing a competing wire manufacturer, and requested that plaintiff become its exclusive distributor of its products within the United States' food service and industrial markets. Under a letter agreement dated April 7, 1983, plaintiff and defendant agreed that plaintiff would become defendant's exclusive distributor for those markets.

The parties operated under this letter agreement until September 26, 1984, when a formalized distribution agreement was signed. Under the formalized distribution agreement, plaintiff was to continue acting as defendant's exclusive distributor for a period of three years, ending December 31, 1987. Subject to the agreement's default provisions, the agreement would automatically renew for successive 12-month terms, unless expressly terminated by either party upon proper notice.

Under the agreement, the distribution of defendant's product operated as follows. Plaintiff would purchase the product directly from defendant and store it in its warehouses. Later, the product would be shipped directly from plaintiff's warehouses to its customers. Plaintiff had four classes of customers: fast-food service chains, equipment manufacturers, catalog houses and food service dealers. In order to service these customers, plaintiff marketed defendant's product through sales representatives who were assigned various sales regions within the United States. Plaintiff had 30 such representatives under contract during the existence of the agreement.

Except for defendant's direct delivery of its product to one customer, defendant had no contact with the downstream purchasers of its product. Additionally, except for defendant's obligation under the agreement to pay one-half of the costs associated with trade shows, promotional literature, and advertisement, defendant contributed no money towards the sale, marketing, or distribution of its product.

In late June 1989, plaintiff and defendant met to discuss a change in the parties' relationship. Basically, defendant proposed to reduce plaintiff's territory within the United States from a national to a regional scope. No agreement, however, could be reached.

After this June 1989 meeting, the parties' relationship began to deteriorate. On August 17, 1989, defendant gave notice to plaintiff of its intent not to renew the agreement after December 31, 1989. Before December 31 could arrive, however, the relationship between the parties disintegrated. This disintegration was attributable to both plaintiff and defendant taking actions in order to position themselves within the market as of the first of the upcoming new year. These actions created friction in the parties' relationship because their new respective positions would be as competitors, rather than parties cooperating under a contractual relationship. Additional friction was created when plaintiff's sales manager, Mark Oleska, left plaintiff's employ in late September and began working for defendant. On November 6, 1989, after a continued breakdown between the parties, defendant terminated plaintiff effective immediately. Finally, on November 14, 1989, plaintiff filed this action.

■■■ Preliminarily, we note that a party seeking a preliminary injunction must establish by a preponderance of the evidence that (1) it has a clearly ascertained right which must be protected, (2) it will be irreparably injured in the absence of that protection, (3) it has no adequate remedy at law, and (4) it is likely to be successful on the merits. (*Rotary Club v. Harry F. Shea & Co.* (1983), 120 Ill. App. 3d 988, 458 N.E.2d 1002.) We further note that the sole role of an ap-

pellate court in addressing the grant or refusal of an interlocutory judgment is restricted to a determination of whether the trial judge correctly exercised his broad discretionary powers. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 422 N.E.2d 1002.) Moreover, as it is not the purpose of the preliminary injunction to determine controverted rights or decide the merits of the case, a court of review looks to the sufficiency of the evidence only for the limited purpose of ascertaining whether the trial court's discretion has been abused. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 682, 379 N.E.2d 1228, 1236.

Turning to the merits of this appeal, we first address the issue of whether plaintiff's customer list constitutes a protectable trade secret under the Illinois Trade Secrets Act (Ill. Rev. Stat. 1987, ch. 140, par. 351 *et seq.* (effective January 1, 1988) (the Act)). According to the principal draftsman of the Act, the Act was derived from the Uniform Trade Secrets Act and constitutes the Illinois legislature's resolve to adopt the uniform act and to correct aberrations appearing within Illinois trade secret case law. (Jager, *Illinois Returns to the Mainstream of Trade-Secret Protection*, CBA Record 18, (October 1988) (hereinafter *Illinois Returns*).) Because the Act is relatively new, very few cases have interpreted it. In relevant part, the Act provides:

> " 'Trade secret' means information, including but not limited to, technical or non-technical data, a \*\*\* compilation, \*\*\* or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Ill. Rev. Stat. 1987, ch. 140, pars. 352(d)(1), (d)(2).

■ The definition of "trade secret" under the Act codifies two distinct requirements present under the Illinois common law. First, under section 2(d)(1), the information for which trade secret protection is sought must be sufficiently secret and derive economic value both to its owner and to competitors because of the information's relative secrecy. (*Carbonic Fire Extinguishers, Inc. v. Heath* (1989), 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 677-78; *Service Centers of Chicago, Inc. v. Minogue* (1989), 180 Ill. App. 3d 447, 454, 535 N.E.2d 1132, 1136; *Illinois Returns*, CBA Record at 20; Schuman, *Protecting Customer Information Under Illinois Trade Secret Law*,

70 Ill. B.J. 548, 552 (May 1982) (hereinafter *Protecting Customer Information*).) Second, under section 2(d)(2), the information must be the subject of reasonable efforts to maintain its secrecy. *Illinois Returns*, CBA Record at 20.

■ Before addressing whether plaintiff established the two requirements of the Act, we note initially that plaintiff's customer list constitutes the type of information the Act intended to protect. (*Carbonic Fire Extinguishers*, 190 Ill. App. 3d at 952, 547 N.E.2d at 677; *Illinois Returns*, CBA Record at 19.) The record reflects that plaintiff's customer list contains the names and phone numbers of over 3,000 customers located across the United States who have either purchased from plaintiff the wire shelving products manufactured by defendant or purchased other goods sold by plaintiff. This type of customer information is expressly eligible for coverage under the Act. Consequently, our analysis focuses on the Act's two requirements.

■ Regarding section 2(d)(1) of the Act, the record reflects that plaintiff satisfied this paragraph. During the hearings, defendant attempted to establish that plaintiff's lists could be easily duplicated by reference to trade journals and the yellow pages or by driving down the street. Mark Oleska and Robert Koch, president of Cari-All, Ltd., both testified to this effect. These witnesses both admitted, however, that no one source would contain a list of names indicating who had purchased products from plaintiff. Rather, both testified that once a general list of names was found, further refinement would be required. Such refinement would include targeted mailings or telephone calls to the various classes of customers to determine whether they were in the market to purchase wire shelving products. Even after this process was completed, only a list of potential customers would exist; more efforts would still be required to sell the customer on the product. Thus, the evidence demonstrated that the customers on plaintiff's list were not readily ascertainable, but could only be produced after significant time, effort, and expense. Accordingly, we conclude plaintiff proved that its customer list was "sufficiently secret" as required under the Act and the case law proceeding it. *Carbonic Fire Extinguishers*, 190 Ill. App. 3d at 953, 547 N.E.2d at 678; see *Protecting Customer Information*, 70 Ill. B. J. at 548-53.

■ From the above discussion, it is also clear that plaintiff's list would have economic value, both actual and potential, to plaintiff as well as its competitors. The evidence demonstrated that plaintiff's customer list contains over 3,000 names and telephone numbers of customers who conduct business across the nation and who have

been sold on their respective need for wire shelving. A party possessing such a list would be at a competitive advantage just based alone upon the effort required to assimilate an equivalent list. (*Cf. Carbonic Fire Extinguishers,* 190 Ill. App. 3d at 953, 547 N.E.2d at 677-78.) Accordingly, we conclude that plaintiff satisfied section 2(d)(1) of the Act.

■ Turning to section 2(d)(2) of the Act, in an effort to show that its lists were the subject of reasonable security measures, plaintiff presented testimony to show that its lists were kept under lock and key. In this regard, Donald Gillis, plaintiff's president, testified that its customer list was only available on computers and only three key employees had access to this computer. While this testimony may be true, no evidence was presented to contradict other testimony to the effect that no restrictions existed upon the hard copies the computer generated. The copies were neither kept under lock and key, nor marked "confidential" or "do not copy." Indeed, the lists introduced into evidence bore no such markings. Moreover, past generations of plaintiff's lists were produced on demand.

To further support its argument that its lists were kept confidential, plaintiff claims that all employees received an employee manual that notified them that plaintiff considered its lists confidential. This manual provided:

> "GAI is a private company, however, in the interest of employee communications, a great deal of GAI information is distributed for internal use. This information is confidential and not to be revealed to any person outside of our company."

Noticeably absent from this paragraph, however, is what "information" plaintiff deemed confidential. Another provision of the employee manual stated that plaintiff's employees were required to sign a confidentiality agreement. No evidence in the record exists, however, that any of plaintiff's employees ever signed a confidentiality agreement. Moreover, if such agreements did exist, none were produced. Given the testimony that copies of plaintiff's lists were available for use in the accounting and customer services department, it was incumbent upon plaintiff to show its employees understood that lists were to be kept confidential. (*I.L.G. Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 94, 273 N.E.2d 393, 396; *Televation Telecommunication Systems, Inc. v. Saindon* (1988), 169 Ill. App. 3d 8, 17, 522 N.E.2d 1359, 1365; *Protecting Customer Information,* 70 Ill. B.J. at 551.) Plaintiff made no such showing.

In addition to the lack of internal security measures, external security measures were lacking. When sales reports were issued to

plaintiff's sales representatives, the reports contained customer information for those regions of even a more detailed character than contained on plaintiff's customer list. The reports, however, were not accompanied by any instructions that the information was to be kept confidential. Moreover, none of the sales representative agreements contained nondisclosure covenants, and no evidence was produced to show that the representatives understood the reports to be confidential. As stated previously, a showing of such an understanding was essential.

In summary, no evidence exists to show that plaintiff took any affirmative measures to keep its lists secret. No evidence was presented regarding internal or external physical security; that confidentiality agreements or understandings existed among those having access to plaintiff's lists; that plaintiff's lists contained confidentiality stamps or were kept under lock and key; or that employees received entrance and exit interviews imparting the importance of confidentiality. Consequently, we conclude that plaintiff failed to produce sufficient evidence to prove that under section 2(d)(2) of the Act, its customer list was the subject of reasonable efforts designed to protect its secrecy. In the absence of such proof at this stage of the proceedings, the circuit court abused its discretion in granting plaintiff preliminary injunctive relief. See *Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 387, 483 N.E.2d 1271, 1278; *Carbonic Fire Extinguishers*, 190 Ill. App. 3d at 951; 547 N.E.2d at 676.

The second issue presented for our review is whether the trial court properly granted preliminary injunctive relief preventing defendant from contacting, interfering, or otherwise doing business with the independent sales representatives under contract with plaintiff.

The record reflects that prior to the breakdown in the parties' relationship, plaintiff had entered into 30 agreements with sales representatives across the country. Contained within 28 of the agreements is a restrictive covenant of which two versions exist amongst the sales representatives. The first version precludes the sales representatives upon termination of their agreement with plaintiff from "represent[ing] the Cari-All *or competitive wire line* for a period of one year from the date of such termination." The other version of the covenant has the same language as the first with the exception that the underlined portion is absent.

Of the 30 sales representative agreements noted above, the record indicates that 19 of the sales representatives have terminated their relationship with plaintiff and have contracted to act as sales

representatives for a new national distributor named Union United Wire, Inc. (Union United). Union United is one-half owned by Donald Gillis, plaintiff's president, and was formed as a consequence of the breakdown in the relationship between plaintiff and defendant. Under an agreement dated September 19, 1989, and effective January 1, 1990, Union United agreed to act as the exclusive United States distributor for United Wire, Inc. (United Wire), a manufacturer of wire products that competes with defendant.

Under the terms of the sales representatives' new agreement with Union United, the sales representatives agree to exclusively represent Union United in their appointed territories. Significantly, the sales representatives further agree that in consideration of their new appointment, they will not represent defendant during the duration of the new agreement or for a one-year period commencing upon the expiration or termination of the new agreement.

As for plaintiff's role in the Union United-United Wire relationship, the record shows that plaintiff is no longer acting as an exclusive, national distributor as it had previously acted for defendant. Rather, its new role is that of sales representative of Union United. In other words, plaintiff's place in the chain of distribution has dropped from that of national distributor to regional sales representative.

■■ The ramification of plaintiff's new role in the market is that it no longer has the same protectable interest that it once had. Proof of a protectable interest is essential to the grant of preliminary injunctive relief. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 387, 483 N.E.2d 1271, 1278.) During the hearings, Donald Gillis testified that the purpose of the initial restrictive covenants was to prevent defendant from terminating plaintiff and taking over plaintiff's sales network, a network which plaintiff spent great time, effort, and money to develop. It is clear from the record, however, that if plaintiff is indeed only a regional sales representative, it no longer needs a national sales network. Plaintiff's need for a sales network only extends to the particular geographic region as to which it acts as a sales representative for Union United. Consequently, plaintiff's protectable interest supports preliminary injunctive relief only as to those sales representatives who presently share plaintiff's geographic territory. Only those sales representatives who marketed defendant's product in the same territory in which plaintiff now works can potentially harm the plaintiff. In summary, of the original 28 representatives bound under a restrictive covenant, plaintiff is only entitled to preliminary injunctive relief as to those representa-

tives whose territory coincides with plaintiff's existing territory. This is the extent of plaintiff's protectable interest. Because our review of the record does not reveal what geographic territory Union United has assigned plaintiff, this case must be remanded for further proceedings.[1]

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.

---

[1]This court expresses no opinion as to the parties' respective rights under the distribution agreement. In particular, we express no opinion on the issue of whether plaintiff was required to provide defendant with customer information under paragraph 6 of the distribution agreement. Our review of the record indicates that the parties agreed that the laws of the province of Quebec would be used to govern and interpret the distribution agreement.

Additionally, this court expresses no opinion as to the validity of the restrictive covenants in which plaintiff has a protectable interest. The record shows that the agreements containing the covenants were sent from plaintiff's home office in Illinois to the various sales representatives across the United States. The sales representatives then signed the agreements and returned them to plaintiff. Performance of the agreements occurred in the representatives' various regions. Consequently, the validity of the covenants raises a potential conflicts of law issue that the parties have not briefed. Moreover, because this court does not know in which geographic region plaintiff works, we are unable to supply a conflicts of law analysis.