**SOUTHWEST WHEY, INC.,**
**a corporation, Plaintiff,**

v.

**NUTRITION 101, INC., an Illinois corporation, and Ross Peter, an individual, Defendants,**

and

**Nutrition 101, Inc., an Illinois corporation, and Ross Peter, an individual, Counterplaintiffs,**

v.

**Southwest Whey, Inc.,**
**Counterdefendant,**

and

**Nutrition 101, Inc., an Illinois corporation, and Ross Peter, an individual, Third–Party Plaintiffs,**

v.

**Jack Muse, Third–Party Defendant.**

No. 98–3217.

United States District Court,
C.D. Illinois,
Springfield Division.

Oct. 16, 2000.

D. Bradley Blodgett, Springfield, IL, Mark C. Metzger, Lisle, IL, for plaintiff.

David A. Rolf, Thomas H. Wilson, Springfield, IL, James C. Brandenburg, St. Louis, MO, for defendant.

## OPINION

RICHARD MILLS, District Judge.

If you do not want another to tell your secrets, you must not tell them yourself.

Seneca: *Phaedra*

## I. BACKGROUND

On May 10, 1989, Plaintiff Southwest Whey, Inc., ("Southwest Whey") and Defendant Nutrition 101, Inc., ("Nutrition 101") entered into a written agreement to operate a joint venture. Southwest Whey agreed to obtain whey from dairies and Nutrition 101 agreed to market whey to hog farmers in the region east of the Mississippi River and in other areas by mutual agreement. The joint venture was dissolved by Southwest Whey on September 16, 1993.

For most of the 1980's, Southwest Whey's business largely consisted of obtaining and selling whey west of the Mississippi River. Jack Muse ("Muse"), Southwest Whey's president, wanted to expand the business geographically. However, his efforts to obtain contracts with dairies or pork producers east of the Mississippi prior to the commencement of the joint venture produced little, if any, success.

Nutrition 101 was owned and operated by Ross Peter ("Peter"). Nutrition 101 primarily sold feed to pork producers. Peter was experienced in marketing feed to farmers and had an extensive customer base of pork producers. Peter and Muse began discussions which led to the formation of the joint venture on May 13, 1989. A written agreement was included "to guide the joint venture." Southwest Whey

"agreed to procure whey from dairies and Nutrition 101 agreed to market whey to hog farmers in the region east of the Mississippi River." The agreement did not specifically include a non-compete restrictive covenant to govern the parties' actions or competition following dissolution.

Neither Southwest Whey nor Nutrition 101 had a written compilation of claimed trade secrets prior to or during the joint venture. The farmer and dairy contracts used by the parties did not contain any confidentiality or non-disclosure provisions. Moreover, Southwest Whey did not impose any confidentiality restrictions upon the dairies to prevent the disclosure of information learned by them from the joint venture regarding the sale, storage, transfer, or delivery of whey. Similarly, no confidentiality restrictions were imposed upon the truck drivers who transported the whey regarding any knowledge they had or may acquire because of their dealings with the joint venture.

By late 1992, a conflict had arisen between the partners to the joint venture. Southwest Whey suggested to Nutrition 101 that the parties consider shutting down the business. In January 1993, the parties met to discuss a proposed buy-sell agreement to wind up the joint venture. Nutrition 101's proposal was not acceptable to Southwest Whey. Southwest Whey's proposal included a restrictive covenant preventing Nutrition 101 from competing with them for ten years. This proposal was rejected by Nutrition 101. The parties were unable to agree to any of the proposals.

By the summer of 1993, Muse began to inform dairies of his plan to end Nutrition 101's interest in the joint venture. Muse visited farmers who purchased whey from the joint venture in St. Louis, Missouri, during the first week of September of 1993. He inquired as to whether farmers would continue to purchase whey at the same terms and prices if the joint venture ended and Southwest Whey ended up with the business. Muse indicated that each farmer agreed that they would continue to purchase from Southwest Whey.

On September 16, 1993, Southwest Whey informed Nutrition 101 that it had decided to cease operations as a joint venture, and that Nutrition 101 would no longer have access to whey from dairies under contract with the joint venture. One month later, Southwest Whey notified the customers of the dispute and solicited their continued business. Southwest Whey had no written contracts with pork producers who had no obligation to continue to take whey and could at any time "come and go."

This case was originally filed on September 11, 1998. On March 31, 2000, Southwest Whey filed its eight-count amended complaint against Nutrition 101, alleging (I) Breach of Contract; (II) Interference with Prospective Advantage; (III) Violation of Illinois Trade Secrets Act ("ITSA") (765 ILCS 1065/1 *et. seq.* (West 1998)); (IV) Violation of Illinois Trade Secrets Act—Exemplary Damages, (765 ILCS 1065/4(b) (West 1998)); (V) Conversion; (VI) Breach of Fiduciary Duty; (VII) Breach of Fiduciary Duty—Exemplary Damages; and (VIII) Breach of Good Faith and Fair Dealing.

Nutrition 101 has moved for summary judgment on four counts: Count II, Interference with Prospective Advantage; Count III, Violation of ITSA; Count IV, Violation of ITSA—Exemplary Damages; and Count VIII, Breach of Good Faith and Fair Dealing.

## II. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In conducting this inquiry, the evidence of the

non-movant is to be believed, and "all justifiable inferences drawn in his favor." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the burden of producing documentary evidence to show the absence of a genuine issue of material fact. A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *See Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987).

### III. Breach of Good Faith and Fair Dealing (Count VIII)

The Court will address the counts in the order addressed by the parties. Count VIII of Southwest Whey's complaint alleges Breach of Good Faith and Fair Dealing. Nutrition 101 moves for summary judgment on Count VIII.

■ A duty of good faith and fair dealing is implied in every contract in Illinois. *See Saunders v. Michigan Avenue National Bank,* 278 Ill.App.3d 307, 315, 214 Ill.Dec. 1036, 662 N.E.2d 602 (1996). Pursuant to the duty, a party vested with contractual discretion is required to exercise that discretion reasonably and not arbitrarily, capriciously, or in a manner inconsistent with the parties' reasonable expectations. *See Northern Trust Co. v. VIII South Michigan Associates,* 276 Ill.App.3d 355, 367, 212 Ill.Dec. 750, 657 N.E.2d 1095 (1995). However,

an independent claim based upon a breach of any implied duty of good faith generally is not recognized in Illinois. *See Echo, Inc. v. Whitson Co., Inc.,* 121 F.3d 1099, 1106 (7th Cir.1997); *See also Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.,* 212 F.3d 373, 381 (7th Cir.2000).

The Court notes that the Illinois Second District Appellate Court recently indicated that an independent action for breach of good faith and fair dealing may exist in certain limited situations. *See Voyles v. Sandia Mortgage Corp.,* 311 Ill.App.3d 649, 656, 724 N.E.2d 1276, 1281, 244 Ill. Dec. 192, 197–98 (2nd Dist.2000). However, that court noted the concern that this recognition "will swallow ordinary breach of contract cases." Accordingly, the court limited its holding to the narrow circumstances of the case before it. *See Voyles,* 311 Ill.App.3d at 656, 724 N.E.2d 1276, 244 Ill.Dec. 192. Illinois courts have been reluctant to allow a plaintiff to bootstrap a breach of duty of good faith and fair dealing claim on the same factual basis as a breach of contract claim. *See Teachers Insurance & Annuity Association of America v. LaSalle National Bank,* 295 Ill.App.3d 61, 74, 691 N.E.2d 881, 891, 229 Ill.Dec. 408 (2d Dist.1998).

■ A review of the complaint indicates that except for one addition, Southwest Whey's breach of duty of good faith and fair dealing claim (Count VIII) is identical to its breach of contract claim (Count I). In Count VIII, Southwest Whey adds one additional sentence alleging that the breach of contract action also constitutes a bad faith claim. Because Illinois generally does not recognize a separate cause of action for breach of duty of good faith and fair dealing, Nutrition 101 contends that it is entitled to summary judgment on Count VIII.

Southwest Whey bases its response on *Voyles.* Specifically, they contend that because Nutrition 101 was allegedly given broad discretion regarding their duties pursuant to the joint venture, there is an

independent cause of action for breach of good faith and fair dealing. However, *Voyles* involved a lender-mortgagee situation in which the lender forced the mortgagee into foreclosure by raising her payments without notice and thereafter refusing her tender of amounts owed. The court found that the conduct complained of was intentional and outrageous. The court concluded that in order to state such a claim, the conduct would have to be similarly egregious. *See Voyles,* 311 Ill.App.3d at 656, 244 Ill. Dec. 192, 724 N.E.2d 1276.

Southwest Whey has alleged no such egregious conduct here. Moreover, their argument that Nutrition 101 had broad discretion pursuant to the joint venture does not alone support an independent cause of action. The key to the *Voyles* decision was the nature of the case and the wrongfulness of defendant's conduct. 311 Ill.App.3d at 656–57, 244 Ill.Dec. 192, 724 N.E.2d 1276. It was not the fact that a party had abused its broad discretion pursuant to a contract.

The court in *Voyles* noted the concern that the recognition of such a tort could "swallow ordinary breach of contract cases." Because of the nature of the case, the risk there was low. *Voyles,* 311 Ill. App.3d at 656, 244 Ill.Dec. 192, 724 N.E.2d 1276. Here, the risk is much greater. Southwest Whey has basically restated its contract claim in Count VIII. They have merely added a sentence to Count I. Therefore, it appears to the Court as though they are merely trying to bootstrap Count VIII to their breach of contract claim. Southwest Whey has failed to articulate any of the criteria identified by the court in *Voyles* that future bad faith claims must meet. Moreover, if Nutrition 101 has failed to exercise its alleged "broad discretion" properly, that can be addressed in the breach of contract action.

Viewing the evidence in the light most favorable to Southwest Whey, the Court finds that there is no genuine issue of material fact. Because Illinois courts generally do not recognize a separate cause of action for breach of good faith and fair dealing, Nutrition 101 is entitled to summary judgment on Count VIII.

In light of the Court's ruling, Southwest Whey requests leave of the Court to allow it to amend Count I of its First Amended Complaint. The Court finds that Nutrition 101 would not be unduly prejudiced were leave to be granted. Therefore, pursuant to Federal Rule of Civil Procedure 15(a), Southwest Whey is hereby granted leave to amend Count I of its amended complaint.

*IV. Trade Secrets (Counts III and IV)*

Southwest Whey alleges that it has developed and used certain trade secrets in connection with the marketing and distribution of whey as a hog feed element. Following the dissolution of the joint venture, Southwest Whey alleges that Nutrition 101's efforts in connection with the marketing and distribution of whey as a hog feed element constitute the misappropriation of trade secrets of Southwest Whey in violation of ITSA. Nutrition 101 moves for summary judgment on Counts III and IV.

In Illinois, a trade secret is defined as:

information, included but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d) (West 1998).

In order to establish improper use of trade secrets, there must be a showing that the information at issue was (1) secret (not

generally known in the industry); (2) misappropriated; and (3) used in the appropriator's business. *See Composite Marine Propellers Inc. v. Van Der Woude,* 962 F.2d 1263, 1265–66 (7th Cir.1992).

Southwest Whey essentially alleges that it brought several methods, techniques, and practices into the joint venture which are the basis of its trade secrets claim. Specifically, in an answer to an interrogatory, Southwest Whey identified the following thirty-one methods, techniques, and practices which constitute trade secrets in connection with the marketing and distribution of whey as a hog feed element: (1) Contract language with farmers; (2) Contract language with dairies; (3) Allowable distance for hauling whey from dairy to farmer for freshness; (4) Allowable distance for hauling whey from dairy to farmer for profit; (5) Techniques for hook ups at dairies; (6) Tank cleaning techniques; (7) Tank configurations, including the pumping equipment and appurtenances; (8) Pricing strategies; (9) How to prevent the whey from destroying concrete; (10) Knowledge of feed characteristics of whey; (11) Knowledge of whey sources generally; (12) Knowledge that farmers would pay for whey; (13) Routes from dairies to the farmers; (14) Customer lists; (15) Vendor lists; (16) Techniques for identifying suppliers and customers; (17) Marketing methods for farmers; (18) Marketing methods for dairies; (19) How to mix and/or dilute whey to make it an effective supplemental feed source; (20) Studies on the nutritional value of whey; (21) Handling plants and managers to minimize inconvenience with truckers; (22) Siting of loading operations; (23) Use tracking at farms to maximize sales and ensure continued customer care; (24) Confinement and location techniques and procedures for use at farms; (25) Development of on-farm delivery system; (26) Use of cone bottom tanks; (27) Recirculation techniques and the need for them; (28) Tank agitation techniques; (29) Screening techniques; (30) Gauge for tank management; and (31) Use of elevator buckets and other products for delivery of whey at farms.

Southwest Whey asserts that it attempted to protect the thirty-one "trade secrets" by not giving them to anyone in their entirety other than Nutrition 101. Thus, they contend that even if some or most of the thirty-one enumerated elements do not constitute trade secrets, "the whole package put together" is a trade secret. Specifically, the various elements combine to form the "overall trade secret" which Southwest Whey has acquired after years of trial and error that has come at great expense.

The Court first notes that a "trade secret" "may include a compilation of confidential business and financial information." *See Nilssen v. Motorola,* 963 F.Supp. 664, 673 (N.D.Ill.1997). The key inquiry in ascertaining whether information is a trade secret under the ITSA is on the secrecy of the information sought to be protected. Specifically, courts look at how easily information can be duplicated without involving substantial time, effort, or expense. *See Hamer Holding Group, Inc. v. Elmore,* 202 Ill.App.3d 994, 1011, 148 Ill.Dec. 310, 560 N.E.2d 907 (1st Dist. 1990). Factors in determining whether information constitutes a trade secret include the following: (1) The extent to which the information is known outside the business; (2) The extent to which it is known by others involved in the business; (3) The extent that measures have been taken to guard the secrecy of the information; (4) The value of the information to the party and his competitors; (5) The amount of money or effort expended by the party in developing the information; and (6) The ease or difficulty with which the information at question could be obtained or duplicated by others. *See Colson Co. v. Wittel,* 210 Ill.App.3d 1030, 155 Ill. Dec. 471, 474, 569 N.E.2d 1082 (4th Dist. 1991).

The Court notes that the statutory protection afforded trade secrets reflects the balancing of social and economic interests.

An individual who has put forth the time, money, and effort to obtain a secret advantage should be protected from a party who obtains the secret through improper means. Nevertheless, in a competitive market, a party is entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation. *See Service Centers of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 452, 535 N.E.2d 1132, 129 Ill.Dec. 367 (1st Dist. 1989).

■■■ Moreover, merely being the first or only one to use certain information does not alone turn what is otherwise general knowledge into a trade secret. Otherwise, no matter how ordinary or well known the information, the first person to use it would be able to obtain the protection of the statute. *See Minogue*, 180 Ill.App.3d at 455, 129 Ill.Dec. 367, 535 N.E.2d 1132. Additionally, "generalized confidential business information" does not constitute a protectable trade secret. *See AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1204 (7th Cir.1987). Specifically, the mere legwork in acquiring this information cannot be the basis for a claim. Any other result would mean that a party who learns the basics of an industry from an individual would be precluded from entering the business at all in a competitive relationship. Such a result is contrary to a free market economy. *See Nilssen*, 963 F.Supp. at 674.

Southwest Whey basically asserts that it is the total process gained over the years that is the trade secret at issue in this case. Southwest Whey has alone on a large scale been able to transform this process into a workable, profitable enterprise. Southwest Whey contends that it has taken sufficient measures to protect its trade secrets. Specifically, although certain aspects of the process were revealed to the dairies, truckers, farmers or supply vendors, only that which was necessary for the process to function was revealed at any time. Muse indicated that only Southwest Whey and Nutrition 101 knew the entire process of marketing and delivering whey. Therefore, the trade secret in the "whole package" was protected.

Moreover, the record reveals that Nutrition 101 is Southwest Whey's only competitor on a major scale in the procurement and selling of whey. There have been, however, a few individual truckers or farmers in the same geographical area engaging in this process on a much smaller scale. These instances are basically limited to the occasional farmer or trucker who hauls whey for the price of freight alone on nothing more than an individual dairy basis. No other entity in the area has engaged in the procurement and selling of whey on such a large scale.

One of the factors in determining whether information constitutes a trade secret involves an analysis of the measures taken to protect the secrecy of the information. *See Colson Co.*, 155 Ill.Dec. at 474, 569 N.E.2d 1082. Southwest Whey asserts that it never revealed the entire process to any individual or group. Rather, the dairies, farmers, truckers, and supply vendors would learn only that which was needed to fulfill their duties. Thus, although the different segments would learn parts of the overall process, only Nutrition 101 was told everything regarding Southwest Whey's enterprise. However, none of the contracts with the other segments contained confidentiality or non-disclosure clauses.

The parties in the instant action dispute whether there was a non-compete clause between them. Paragraph (13) of the Joint Venture agreement reads "101 personnel to sign agreement not to pass information or data to non involved parties or be involved in any aspect of whey marketing other than as representatives of 101." Southwest Whey contends that this language constitutes a non-compete clause. Nutrition 101 alleges that this language merely means that if an employee were to leave Nutrition 101, he could not use this information further. This provision only involved Nutrition 101 because only they had employees. Moreover, Nutrition 101

contends that the fact that the parties discussed a possible restrictive covenant when they discussed the buy/sell arrangement of the joint venture is evidence that there was not a non-compete clause in the original agreement.

Southwest Whey also alleges that when the agreement was made, the parties contemplated that no termination would occur. "It's either for life or we won't do it." Therefore, the agreement contains no provision detailing what Nutrition 101 could do following a termination. Nutrition 101 contends that because the agreement does not provide for a dissolution date or event, it could be terminated by either party at any date. Moreover, it was Southwest Whey who eventually terminated the agreement.

■ The Court will now address whether each of the statutory prongs is met.

### (A) Sufficiently Secret to Derive Economic Value

Pursuant to the statute, the Court must determine first whether the information sought to be protected as a trade secret is sufficiently secret to derive economic value from not being generally known. Certainly, the affidavit and deposition testimony of Jack Muse is important to this inquiry. Muse indicated that Southwest Whey alone was engaged in the business on a major scale. Moreover, they were the first to engage in the process of successfully marketing and delivering whey on such a scale. These facts indicate that Southwest Whey was engaged in a profitable enterprise. However, the fact that a party was the first or only entity to utilize certain information does not turn what is otherwise general information into a trade secret. See Minogue, 180 Ill.App.3d at 455, 129 Ill.Dec. 367, 535 N.E.2d 1132. As Nutrition 101 contends, some of the individual "secrets" that make up the whole package do seem to constitute general information that can be readily ascertained. For example, the individual secrets that relate to Southwest Whey's knowledge of whey characteristics could be construed as general knowledge that has long been available to the public.

Moreover, Southwest Whey alleges that its process of hauling whey from a dairy to a farmer while maintaining the freshness and making a profit is also a trade secret. However, as Nutrition 101 notes, farmers had been doing this since before the joint venture began, albeit on a smaller scale. Southwest Whey contends that because this has only been done on a smaller scale, issues of freshness and profits are more applicable to their transportation of whey. The fact that these farmers did this on a smaller scale does not mean that issues of profits and freshness were not important. The farmers were no less trying to maintain the freshness and make a profit.

Moreover, some of what are alleged to constitute a portion of the trade secret appear to amount to nothing more than Muse's legwork in establishing his business. Mere legwork in identifying the basics of the industry cannot serve as the basis for a claim under the Act. See Nilssen, 963 F.Supp. at 674. Muse contends that one component of the overall trade secret is his pricing strategy. His basic strategy has been to charge $4 a ton margin over the cost of freight. This appears to be the result of Muse's legwork in identifying how much he could charge while still making a good profit within the industry. As Nutrition 101 contends, it cannot be true that anyone who employs a similar pricing strategy in seeking to make a profit on whey is violating a trade secret.

Nonetheless, Southwest Whey maintains that it is the "whole package" which constitutes a trade secret. The first prong of the statute requires the Court to assess whether the relevant information was sufficiently secret to derive economic value. At this stage, the Court must view the evidence in the light most favorable to Southwest Whey. It is undisputed that Southwest Whey's only competitor on a

major scale is Nutrition 101. Although there may have been individual truckers or farmers engaged in the business on a much smaller scale, there were no other participants in the industry of the same magnitude as Southwest Whey. This is instructive in determining whether Southwest Whey's collection of information acquired over the years is sufficiently secret to derive economic value. It is true that some of the items that constitute a portion of the trade secret are not trade secrets. However, the fact that only Southwest Whey has engaged in the business at this level at least raises a material fact as to the first prong of the statute. Specifically, there is a material issue as to whether the entire package is sufficiently secret to derive economic value.

### (B) Reasonable Efforts to Maintain Secrecy

The second prong involves the efforts of the owner to maintain the secrecy of the alleged trade secret. *See Thermodyne Food Service Products, Inc. v. McDonald's Corp.*, 940 F.Supp. 1300, 1306 (N.D.Ill. 1996). Nutrition 101 alleges that Southwest Whey has failed to take any affirmative measures to protect its trade secret.

■ The record reveals that no restrictive covenant was signed between the parties to the action. However, it is important to note that a restrictive covenant or confidentiality agreement is not a prerequisite to recovery under the ITSA. *See Hexacomb Corp.*, 875 F.Supp. at 464. Nonetheless, some affirmative step must be taken to maintain the trade secret. *See Gillis Associated Industries, Inc. v. Cari–All, Inc.*, 206 Ill.App.3d 184, 191–92, 564 N.E.2d 881, 151 Ill.Dec. 426 (1st Dist. 1990). Southwest Whey contends that the language in Paragraph 13 of the written agreement constitutes a restrictive covenant: "101 personnel to sign agreement not to pass information or data to non involved parties or to be involved in any aspect of whey marketing other than as representatives of 101." However, the Court finds that this language was included in the agreement to prevent employees of Nutrition 101 from entering the market on their own. The Court notes that the parties discussed the possibility of entering into a restrictive covenant when they discussed terminating the joint venture. This indicates that there was no restrictive covenant from the outset. Thus, the language in the agreement does not constitute a restrictive covenant.

Southwest Whey attempts to get around this by arguing that their agreement with Nutrition 101 was an agreement to do business forever. Muse indicated that he would not have entered into the agreement if it had an end to it. However, the written agreement between the parties does not specify a definite term or a particular undertaking. According to Illinois partnership law, "dissolution is caused ... by the expressed will of any partner when no definite term or particular undertaking is specified." 805 ILCS 205/31(1)(b). Therefore, Southwest Whey's argument that the partnership was an agreement to do business forever is without merit.

The record is clear that there was no written record of trade secrets at any time prior to or during the joint venture. Nonetheless, Southwest Whey alleges that Nutrition 101 would not have been exposed to their trade secrets and allowed into the partnership unless it was for life. However, because the partnership agreement did not specify a particular amount of time, it was subject to dissolution at any time. Therefore, the Court rejects Southwest Whey's contention that their means of protecting their trade secrets was to form a partnership for life.

Moreover, neither the farmer nor the dairy contracts used by the joint venture contained any confidentiality or non-disclosure provisions. Southwest Whey imposed no restrictions upon the dairies in their negotiation of contracts regarding the disclosure of information about the joint venture regarding the sale, storage, transfer, or delivery of whey. Similarly, no restric-

tions were placed on the truck drivers who hauled the whey regarding any knowledge they had or might acquire because of their relationship with the joint venture. In short, Southwest Whey did not insist on any non-disclosure clauses. This is true despite the fact that such clauses were not uncommon in the industry.

Southwest Whey responds by noting that Nutrition 101 was the only other entity which knew everything about the process of successfully marketing and delivering whey. Muse's approach was to keep the different segments of his business separate. Moreover, he did not tell his clients about his business or reveal its contract terms with the farmers to the dairies. Thus, although the various entities could learn bits and pieces, only Nutrition 101 was exposed to the whole process.

The Court is not persuaded that Southwest Whey used reasonable efforts to maintain the secrecy of its trade secrets. The record does not reveal any affirmative steps taken by Southwest Whey to protect its trade secrets.

Southwest Whey did not insist upon Nutrition 101 signing a restrictive covenant at any time before, during, or after the joint venture. Moreover, they did not require any of the truckers, farmers, dairies, or other parties to sign non-disclosure clauses. The argument that no specific entity other than Nutrition 101 was exposed to the entire process does not constitute a reasonable effort to maintain the secrecy. This merely means that Southwest Whey did not reveal all of the thirty-one enumerated secrets that make up the entire package except to Nutrition 101. However, some of the trade secrets deal specifically with a particular industry. The Court notes that it would only make sense that the secrets related to the dairy industry would only be revealed to those in the dairy industry, not in the farming industry. Thus, the twelve secrets that may be classified as involving the dairy industry were revealed only to those in the dairy industry. Nothing prevented those in the dairy

industry from sharing these secrets. The fact that these dairy secrets may not have been revealed to those in the transportation industry is not a reasonable effort to maintain the secrecy. Similarly, Southwest Whey took no reasonable steps to prevent the truckers from revealing the secrets that pertain to the transportation industry. Nothing prevented these truckers from sharing the secrets. The fact that these secrets may not have been revealed to those in the dairy industry does not constitute a reasonable effort to maintain the secret.

Accordingly, even when viewing the evidence in the light most favorable to Southwest Whey, there is no genuine issue of material fact that they failed to take any reasonable efforts to maintain the secrecy of the trade secrets. This is a prerequisite under the Trade Secrets Act. Therefore, summary judgment is allowed as to Counts III and IV.

Because Southwest Whey has failed to establish the existence of a trade secret pursuant to the statute, the Court need not address whether any trade secret was misappropriated by Nutrition 101.

### V. Interference with Prospective Advantage (Count II)

In Count II, Southwest Whey alleges that Nutrition 101 interfered with their prospective advantage regarding existing relationships and potential outlets for the marketing of whey. Southwest Whey contends that this was accomplished through disparaging remarks and material misrepresentations, the harassment and attempted influence of truckers, and by creating confusion and misunderstanding regarding Southwest Whey's ability to conduct business. Nutrition 101 moves for summary judgment on Count II.

 In order to prevail on a claim for tortious interference with prospective advantage, a plaintiff must prove the following: (1) It had a reasonable expectation of entering into a valid business relationship; (2) Defendant had knowledge of plaintiff's

expectancy; (3) Defendant's purposeful interference prevented plaintiff's legitimate expectation from ripening into a valid business relationship; and (4) Damages resulted from the interference. *See Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991).

■ Nutrition 101 first asserts that Southwest Whey has failed to establish that it had an expectancy of entering into an ongoing business relationship. Moreover, Southwest Whey has failed to show that Nutrition 101's alleged interference proximately caused or prevented them from entering into a business relationship with whey outlets. This is due to the fact that there were other reasons why Southwest Whey lost customers: cheaper alternatives, changes in the whey product, dietary and nutrition concern for the hogs, or finding another source of whey. The same can be said about Southwest Whey's relationship with dairies.

■ Nutrition 101 also asserts that its conduct constitutes privileged competition. The privilege of competition does extend to the tort of interference with prospective business advantage. Specifically, the privilege to engage in business and competition allows a party to divert business from his competitors if the intent is at least partially to further one's business and is not solely motivated by spite or ill will. Certain acts of competition are never privileged. These include fraud, deceit, intimidation, or deliberate disparagement. *See Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill.App.3d 606, 615–16, 663 N.E.2d 1, 215 Ill.Dec. 251 (1st Dist. 1995).

Nutrition 101 claims that it was merely engaged in competition with Southwest Whey in the procurement and sale of whey. No illegal tactics were employed. Moreover, they maintain that Southwest Whey's assertion of interference on the part of Nutrition 101 amounts to little more than conclusory allegations. Additionally, even if the Court were to find that

disparaging remarks were made, the claim must nonetheless fail because the parties to whom such remarks were made failed to change their business relationships with Southwest Whey. Nutrition 101 was only pursuing its own interests in acquiring contracts at the expense of Southwest Whey.

Southwest Whey claims that shortly after the dissolution, Nutrition 101 contacted various parties and attempted to get them to cancel contracts with Southwest Whey. Southwest Whey also alleges that Nutrition 101 suggested to others that they quit buying whey for a certain amount of time which would result in Southwest Whey losing contracts with dairies. Moreover, Southwest Whey contends that Nutrition 101 attempted to interfere with their relationship with truckers hauling whey by following them from the dairies to their destinations. Southwest Whey maintains that it is proper to infer that the same tactics were used on other dairies, truckers, and hog producers after the joint venture was terminated. They base this allegation on the fact that Muse went to all the hog farmers who committed to stay with Southwest Whey if the joint venture ended. Southwest Whey alleges that after Nutrition 101 visited the same hog producers, they changed their commitment. Finally, Southwest Whey contends that the privilege of competition does not extend to the tort of interference with contractual relations. *See Soderlund*, 278 Ill.App.3d at 618, 215 Ill.Dec. 251, 663 N.E.2d 1.

The Court notes that Southwest Whey's response consists primarily of the deposition testimony of Muse. For example, Southwest Whey asserts that Nutrition 101 contacted Dick Alber in an attempt to get Dean Foods to cancel its contract with Southwest Whey. However, the record reflects that Dean Foods allowed its five year contract to expire in 1996. Moreover, they invited Southwest Whey to submit a proposal to go forward from 1996. Thus, even if Nutrition 101 attempted to get Dean Foods to cancel its contract with

Southwest Whey in 1993, there were no damages.

Southwest Whey also asserts that Nutrition 101 attempted to bribe Bob Schuller to cancel his contract to haul whey. However, after the dissolution of the joint venture, Schuller continued to haul whey for Southwest Whey until he got out of the business. Nutrition 101 did nothing to prevent him from hauling whey for Southwest Whey. Thus, the alleged conduct on the part of Nutrition 101 did not interfere with Southwest Whey's business relationship.

Southwest Whey next alleges that Nutrition 101 in December 1993 contacted Berne Cheese Company and attempted to persuade them to cancel their contract with Southwest Whey. However, Southwest Whey maintained its contract with Berne Cheese until the latter went bankrupt. Hence, no damages resulted from any interference on the part of Nutrition 101.

Southwest Whey next contends that Nutrition 101 contacted farmer Scott Chamberlain and convinced him to cancel his contract with Southwest Whey and receive whey from Nutrition 101. However, Chamberlain indicated that he began obtaining whey in 1992 or 1993 from Dean Foods through Nutrition 101. Around the time of dissolution, Muse approached Chamberlain and indicated that Southwest Whey now had the contract with Dean Foods and would be supplying the whey. After contacting Ross Peter, Chamberlain decided to continue obtaining whey from Nutrition 101 primarily because he had always dealt with them in the past and was more familiar with them. There is nothing to indicate that Nutrition 101 interfered with Southwest Whey's relationship with Chamberlain.

Southwest Whey also alleges that Nutrition 101 sent a proposed contract to Jaeggi's Hillsdale Cottage Cheese and attempted to entice them to break their contract with Southwest Whey. However, the record reflects that Southwest Whey continues to do business with Jaeggi's. Therefore, any interference on the part of Nutrition 101 did nothing to damage Southwest Whey.

Southwest Whey next contends that Nutrition 101 contacted pork producer and Southwest Whey customer Homer Carl and suggested that he stop buying whey. This would result in their loss of a contract with Berne Cheese Co. Nutrition 101 subsequently submitted a proposal to sell whey at a lower price. Moreover, Southwest Whey also contends that Nutrition 101 contacted hog producers Joe Knuffman and Stan Lentz and suggested that they stop buying whey from Southwest Whey which would have resulted in the loss of dairy contracts. Nutrition 101 contends that these actions constitute an attempt to organize a boycott. However, the record indicates that Homer Carl continued to obtain whey from Southwest Whey until they could no longer provide him with sweet whey. Nothing that Peter or Nutrition 101 did played a role in terminating his relationship with Southwest Whey. Therefore, no action on the part of Nutrition 101 interfered with that business relationship.

As for Joe Knuffman, he continued purchasing whey from Southwest Whey until 1997. Moreover, he does not specifically recall any negative comments made by a Nutrition 101 representative toward Southwest Whey. In short, nothing that Nutrition 101 did or said affected his business relationship with Southwest Whey. Accordingly, no action on the part of Nutrition 101 interfered with Southwest Whey's relationship with Knuffman.

Southwest Whey also alleged that Nutrition 101 had informed Stan Lentz that if he stopped buying whey from Southwest Whey, it could be obtained at a better price. However, Lentz indicated that he did not recall either Peter or Nutrition 101 ever interfering in his business relationship with Southwest Whey. Moreover, no representative of Nutrition 101 ever insult-

ed or downgraded the business practices of Southwest Whey. Lentz did not recall specifically why he stopped doing business with Southwest Whey in the fall of 1993. He speculated that it was likely because he could get a similar product at a cheaper price from another dairy. Thus, it was not related to any interference on the part of Nutrition 101. Southwest Whey next contends that Nutrition 101 attempted to interfere with Southwest Whey's relationship with the truckers hauling their whey. They allege that Nutrition 101 followed trucks delivering whey from the dairies to their destinations on two different occasions. Randy Peter indicated that in early 1994, he followed a whey truck because he was concerned about where the whey was going and how it was handled. Although this behavior is somewhat peculiar because the joint venture had ended, there is no indication that Peter harassed the truckers or interfered in their business in any way.

Southwest Whey states that it is proper to infer that Nutrition 101 used similar tactics on other dairies, truckers, and hog producers following the termination of the joint venture. Southwest Whey has made numerous allegations that Nutrition 101 sought out customers of the joint venture following its termination and attempted to interfere with their business relationship. However, Nutrition 101 has refuted these allegations in each instance. In some instances, the customer indicated that Nutrition 101 did nothing to interfere with the business relationship. In other instances, the customer of the joint venture is still doing business with Southwest Whey or did for some time after the allegedly improper conduct. In those situations, no damages therefore resulted from any interference. In order to prevail on a claim of tortious interference with prospective advantage, damages must be shown. *See Fellhauer,* 142 Ill.2d at 511, 154 Ill.Dec. 649, 568 N.E.2d 870.

In their response, Southwest Whey seems to also rely on the tort of interference with contractual relations. However, as Nutrition 101 notes, a necessary element of that tort is that a defendant intentionally induce a breach of contract without privilege to do so. *See Galinski v. Kessler,* 134 Ill.App.3d 602, 610, 480 N.E.2d 1176, 89 Ill.Dec. 433 (1st Dist. 1985). Because there has been no breach of any contract with Southwest Whey, they cannot support a claim under this theory.

Southwest Whey seems to suggest that this Court should infer that Nutrition 101 used illegal tactics in interfering with their business relationships. However, with the exception of one instance, Nutrition 101 responded to each of the business practices which allegedly supported a claim for interference with prospective advantage. Southwest Whey has failed to come forward with any evidence that would create an issue of fact regarding these practices. The one instance in which Nutrition 101 did not respond involved the deposition testimony of Homer Carl. His testimony indicated that Nutrition 101 came to him and suggested that he stop buying whey from Southwest Whey. This would have resulted in Southwest Whey's loss of a dairy contract. However, Homer Carl continued to obtain his whey from Southwest Whey. Therefore, no damages resulted from these alleged tactics.

Southwest Whey is basically asking the Court to infer from that one instance that Nutrition 101 interfered with their prospective advantage at other times. However, the only evidence that they have put forth essentially is the deposition testimony of Muse. Nutrition 101 has come forward in each instance with evidence that they did not interfere with Southwest Whey's prospective advantage. When the moving party has met its burden, the opposing party must come forward with specific evidence which demonstrates that there is a genuine issue for trial. *See Howland,* 833 F.2d at 639. This Court must merely draw all reasonable inferences based on the evidence in Southwest Whey's favor and not all conceivable inferences. *See Bank Leumi Le–Israel, B.M.*

*v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). A scintilla of evidence in favor of the non-movant is not sufficient. *See Brownell v. Figel,* 950 F.2d 1285, 1289 (7th Cir.1991).

Therefore, when taking all of the evidence in the light most favorable to Southwest Whey, the Court finds that there are no genuine issues of material fact to be determined and that Nutrition 101 is entitled to judgment as a matter of law.

*Ergo,* Nutrition 101's Motion for Summary Judgment as to Counts VIII, III, IV, and II is ALLOWED. Pursuant to Federal Rule of Civil Procedure 15(a), the Court grants Southwest Whey seven (7) days leave to amend Count I of its First Amended Complaint.